SHAPIRO, J.
Plaintiff, Kerry Jendrusina, filed this medical malpractice case against his primary care providers, Dr. Shyam Mishra, a specialist in internal medicine, and Shyam N. Mishra, M.D., PC. Defendants moved for summary disposition, asserting that plaintiffs notice of intent to sue, and therefore the complaint, had not been timely filed. Plaintiff responded that the claim had been initiated within the six-month discovery period defined by the Legislature in MCL 600.5838a. That statute provides, in pertinent part, “[A]n action involving a claim based on medical malpractice may be commenced. . . within 6 months after the plaintiff discovers or should have discovered the existence of the claim . . . .” MCL 600.5838a(2) (emphasis added). The trial court granted defendants’ motion, finding that the claim was not timely. In so ruling, the trial court effectively substituted the phrase “could have” for “should have” in the statute. Because we are to follow the text of the statute as written, we reverse and remand.
On January 3, 2011, plaintiff went to the hospital with flu-like symptoms. He was found to be dehydrated, and, after performing various tests, the hospital staff determined that plaintiff was in irreversible kidney failure. As a result, plaintiff was placed on lifetime dialysis with its attendant morbidity and mortality.
Plaintiff asserts that defendants failed to take action as required by the relevant standard of care, such as a referral to a nephrologist (kidney specialist), despite the fact that for several years plaintiffs blood tests—contained within plaintiffs medical chart maintained by Mishra—demonstrated worsening and even *625 tually irreversible kidney disease. Plaintiff further asserts that had Mishra complied with the standard of care, plaintiffs irreversible kidney failure would have been avoided.
According to plaintiff, he did not discover the existence of his claim until September 20, 2012. On that date, plaintiff was seen by Dr. Jukaku Tayeb, a treating nephrologist. According to plaintiffs testimony:
[Tayeb] came in and what it was, he got full biopsy, not just a short version out of Clinton Henry Ford, out of Detroit. He got that and read through it and reviewed the case and talked to the pathologist, I guess, and he goes, “I got your full pathology report here,” and he goes, “Did your doctor — Why didn’t you come to a nephrologist?” I said I was with an internist. The internist said everything was fine.... Then he started ranting, saying, “The doctor should have sent you. I could have kept you off of dialysis. You should have came [sic] here years ago. I could have prevented you from being on dialysis and you going into full kidney failure, if you would have came [sic] to a nephrologist early on.”
Plaintiff testified that when Tayeb told him this, he “was shocked. I was dumbfounded. That was like someone punching me in the gut.” He testified that before that conversation with Tayeb, he did not know his kidney failure had developed over years and could have been avoided with an earlier referral and treatment. He testified that until then, “I thought it happens, it happens.” He testified that immediately after this visit with Tayeb, he called his wife and said: “Oh, my God. I think Mishra screwed up.” The following day, plaintiff contacted an attorney. Calculating the six-month discovery period from September 20, 2012, plaintiff timely initiated this case. The trial court concluded, however, that plaintiff should have discov *626 ered the existence of his claim when he was diagnosed with kidney failure in January 2011.
In reviewing the trial court’s analysis, we must be strictly guided by the language of the statute. “If the language of a statute is clear and unambiguous, this Court must enforce the statute as written.” People v Dowdy, 489 Mich 373, 379; 802 NW2d 239 (2011).
Our function in construing statutory language is to effectuate the Legislature’s intent. Plain and clear language is the best indicator of that intent, and such statutory language must be enforced as written. [Velez v Tuma, 492 Mich 1, 16-17; 821 NW2d 432 (2012) (citations omitted).]
Significantly, we note that the Legislature chose the phrase “should have” rather than “could have” in the statutory text. According to the New Oxford American Dictionary (3d ed), “could” is “used to indicate possibility,” whereas “should” is “used to indicate what is probable.” (Emphasis added.)[1] Therefore, the inquiry is not whether it was possible for a reasonable lay person to have discovered the existence of the claim; rather, the inquiry is whether it was probable that a reasonable lay person would have discovered the existence of the claim.
Plaintiffs medical chart maintained by Mishra includes the results of his routine blood tests. Beginning in 2007, lab reports filed within the chart consistently *627 contained abnormal and worsening levels of two blood measures related to kidney function: creatinine[2] and eGFR.[3]
While these test results are clearly relevant to the issue of whether Mishra complied with the standard of care, they are not relevant to the issue of when plaintiff should have discovered his potential claim unless there is evidence that plaintiff was made aware of the repeated and increasingly abnormal indications of kidney disease. Defendants offer no evidence that this was the case. First, it is undisputed that defendants’ office never provided plaintiff with copies of his lab reports. Second, plaintiff testified that defendants never told him that he had kidney disease or that he might develop kidney disease. Indeed, given defendants’ failure to introduce contrary evidence, defendants have not even created a question of fact on the issue.[4]
Defendants point out that in a 2008 office note, Mishra wrote down a diagnosis of “chronic renal fail *628 ure.” However, the note contains no reference to a discussion of this with the patient, i.e., plaintiff, and plaintiff testified that no such discussion ever occurred. Specifically, plaintiff testified as follows:
Q. ... I’m looking at your records from Dr. Mishra’s [office], December 22nd, 2008, so this would have been a few days before Christmas at the end of 2008. Dr. Mishra had diagnosed you with chronic renal failure; do you remember that?
A. No, he never told me that.
Q. You don’t remember having any discussion with him about that then?
A. No, not at all.
Q. You had swelling in your legs at that time. Do you remember that?
A. Yes. He said it was because of my weight problem.
Q. So you don’t remember any discussion December 2008 about having chronic renal failure?
[Objection omitted.]
A. No.
Q. When is the first time you recall having a discussion with Dr. Mishra about kidney failure?
A. He never discussed it with me.
Defendants have not submitted any evidence indicating that, contrary to plaintiffs testimony, Mishra discussed this diagnosis with plaintiff. As noted, the office chart does not indicate that the diagnosis was relayed to or discussed with the patient, and it is undisputed that plaintiff neither saw nor had copies of those records until after he retained an attorney immediately following his September 20, 2012 conversation with Tayeb.[5]
*629 In Solowy v Oakwood Hosp Corp, 454 Mich 214, 221-222; 561 NW2d 843 (1997), our Supreme Court held that what the claimant discovered or should have discovered is “a possible cause of action.” This point was critical in Solowy because the plaintiff in that case did not dispute that she knew her doctor might have committed malpractice. Id. at 225. Instead, she argued that the six-month time frame was not triggered until she had, in her own mind, confirmed that this was the case. Id. at 218-219. The facts of Solowy merit description. In 1986, the plaintiff had skin cancer on her ear. Id. at 216. The defendant excised it, and, according to the plaintiff, he told her in the same year that the cancer was “gone.” Id. at 216-217. Then in 1992, the plaintiff discovered a similar lesion on her ear at the same site, but she took no action for some time because of the defendant’s assurance that the cancer was gone. Id. at 217-218. Eventually she went to a new doctor who advised that the new lesion was either a recurrence of the prior cancer or a benign lesion. Id. at 217. A biopsy showed that it was a recurrence, and the plaintiff claimed that a more invasive surgery was required as a result of the defendant’s incorrect assurance to her that the cancer was gone. Id. at 217-218. The plaintiff filed suit less than six months from the date of the biopsy but more than six months from the date the second doctor told her that the lesion might be a recurrence of her cancer. Id. at 218.
The plaintiff argued that even though she knew that she had a possible cause of action after being so advised, it was only after the biopsy that she knew or should have known that she had an actual cause of *630 action. Id. at 224-225. She argued that, had the biopsy been benign, she would have learned that her possible cause of action was, in fact, not a cause of action. Id. The Solowy Court concluded that the discovery date is when the plaintiff learns of a “possible cause of action” rather than learning of a “certain” cause of action. Id. at 221-222. However, the Solowy Court continued to apply the “should have” standard, stating:
[T]he discovery rule period begins to run when, on the basis of objective facts, the plaintiff should have known of a possible cause of action. [Id. at 222.]
In Solowy, the time began to run when the plaintiff learned that there was a significant chance—in Solowy it was 50/50—that her doctor had committed malpractice. She knew that if her diagnosis was skin cancer, then she had grounds to file suit because she had previously had skin cancer at that location, it had been treated, and her doctor told her that it was “gone.” Id. at 217, 224.
In the instant case, the record does not support the view that, when diagnosed with kidney failure, plaintiff “should have known of a possible cause of action.” Id. at 222. As far as he knew, he had no previous history of kidney disease and did not know of the lab reports showing that his kidney failure was the result of a slowly progressing condition rather than an acute event. In Solowy, the plaintiff knew that her doctor might have committed malpractice as soon as the tumor grew back; she was only waiting to learn whether she was in fact injured as a result of his actions. In this case, the opposite is true; after diagnosis in January 2011, plaintiff knew he was sick, but he lacked the relevant data about his worsening lab reports and the medical knowledge to know that his doctor might have committed malpractice. The critical *631 difference between plaintiff in this case and the plaintiff in Solowy is that the plaintiff in Solowy neither required nor lacked special knowledge about the nature of the disease, its treatment, or its natural history.[6] She knew exactly what her relevant medical history was at all times. She simply delayed pursuing her claim in order to wait for final confirmation of what she already knew was very likely true. Moreover, the Solowy plaintiff had visible symptoms that were clearly recognizable as a likely recurrence of her skin cancer long before the ultimate diagnosis. In this case, however, plaintiffs first recognizable symptom, i.e., urine retention, did not occur until January 2011 when it precipitated his hospitalization.
“[T]he discovery rule period begins to run when, on the basis of objective facts, the plaintiff should have known of a possible cause of action.” Id. at 222. An objective standard, however, turns on what a reasonable, ordinary person would know, not what a reasonable physician (or medical malpractice attorney) would know. Therefore, the question is whether a reasonable person, not a reasonable physician, would or should have understood that the onset of kidney failure meant that the person’s general practitioner had likely committed medical malpractice by not diagnosing kidney disease.
Indeed, defendants do not contend that a reasonable lay person understands the anatomy, physiology, or pathophysiology of kidneys. One would be hard-pressed to find a reasonable, ordinary person—who is *632 not a medical professional—who knows what creati-nine is or what an abnormal creatinine level means in addition to knowing how kidneys fail, why they fail, and how quickly they can fail.[7]
Moreover, plaintiff did not visit Mishra specifically for kidney problems. He saw him as a primary care provider for over 20 years. Unlike the plaintiff in So-lowy, plaintiff never had surgery or even any treatment for the relevant organ or condition. He had routine complete blood counts and metabolic lab work done, as does virtually every patient who undergoes annual physicals. There is no evidence that he ever saw the blood test reports that showed the normal reference ranges, which would have revealed that his creatinine levels were high, or that he was ever advised of the relationship between creatinine levels and kidney disease. Defendants suggest that because Mishra once ordered a kidney ultrasound for plaintiff after an episode of edema and one slightly elevated lab report in 2008, plaintiff should have realized upon diagnosis of kidney failure that he had kidney disease back in 2008. However, the ultrasound was reported as normal.[8] As *633 suming that a reasonable, ordinary person would even recall a normal ultrasound performed years earlier, there is no reason that such a person would consider a normal ultrasound result as evidence that Mishra was simultaneously committing malpractice in some manner. Rather, the normal ultrasound rationally supported that Mishra had made no errors at all. The mere performance of a noninvasive, commonly administered kidney-imaging study that yielded a normal result does not constitute an “objective fact” from which plaintiff should have surmised that he had a possible cause of action when later diagnosed with kidney failure. See Solowy, 454 Mich at 222.
It was possible for plaintiff to have discovered the existence of a possible claim shortly after presenting to the hospital and being told that he had kidney failure. To have done so, however, he would have had to have undertaken an extensive investigation to discover more information than he had. Presumably, plaintiff could have (1) studied the various causes and speeds of progression of kidney disease, (2) requested *634 copies of his previous years’ blood test reports, and (3) considered whether there were signs of progressive kidney disease in those reports. However, there is no basis in statute, common law, or common sense to impute such a duty to people who become ill.
Defendants seem to suggest that the diagnosis of any serious illness in and of itself suffices to place on a reasonable person the burden of discovering a potential claim against a primary care physician if at any time in the past the physician tested an organ involved in a later diagnosis and reported normal results.[9] Certainly any new diagnosis or worsened diagnosis or worsened prognosis is an “objective fact,” but it is a substantial leap to conclude that this fact alone should lead any reasonable person to know of a possible cause of action. We agree that anytime someone receives a new diagnosis, worsened diagnosis, or worsened prognosis, that individual could consider whether the disease could or should have been discovered earlier. Moreover, diligent medical research and a review of the doctor’s notes might reveal that an earlier diagnosis should have been made. That, however, is not the standard. We must determine what the plaintiff “should have discovered” on the basis of what he knew or was told, not on the basis of what his doctors knew or what can be found in specialized medical literature. Therefore, the elevated levels of creatinine in plaintiffs blood tests during prior years is of no moment given the absence of any evidence that plaintiff ever saw those reports or that he knew what the word “creatinine” meant, let alone the pathophysiology of kidney failure, its measures, its *635 causes, its natural history, or its treatment.[10]
To hold as defendants suggest would not merely be inconsistent with the text of the statute, but it would also be highly disruptive to the doctor-patient relationship for courts to advise patients that they “should” consider every new diagnosis as evidence of possible malpractice until proven otherwise. Had the Legislature intended such a result, it would have used the phrase “could have discovered,” not “should have discovered.”
On the present facts, defendants have demonstrated that before the September 20, 2012 meeting with Tayeb, plaintiff could have discovered that he had a possible cause of action for malpractice. However, the statute triggers the six-month discovery period only when plaintiff should have discovered that he had a possible cause of action. Given the plain language of the statute, the trial court erred by granting defendants’ motion for summary disposition.[11]
*636 Reversed and remanded for further proceedings. We do not retain jurisdiction.
GLEICHER, P.J., concurred with SHAPIRO, J.

 Other dictionaries provide consistent definitions. Merriam-Webster’s Collegiate Dictionary (11th ed) defines “could” as “an alternative to can suggesting less force or certainty” and “should” as “used in auxiliary function to express obligation.” Random, House Webster’s College Dictionary (2d ed) defines “could” as “used to express conditional possibility or ability and “should” as “used to indicate duty, propriety, or expediency.”

 Creatinine is a waste product of muscle metabolism that is normally filtered out by the kidneys and discharged in urine. Standard blood test panels include a measure of creatinine in the blood. According to the record before us, normal blood levels of creatinine are in the range of 0.5 to 1.3 milligrams per deciliter of blood (mg/dL). If creatinine levels go above that range, the elevated levels suggest that the kidneys are not adequately filtering creatinine, which may be a sign of kidney failure. According to Dr. Mishra’s records, plaintiffs creatinine level in 2007 was 1.5 mg/dL. Over the next several years, plaintiffs creatinine level, according to Dr. Mishra’s chart, grew increasingly elevated until it reached 4.99 mg/dL by the end of 2010.

 The lab measure known as eGFR refers to “estimated glomerular filtration rate” and should normally be greater than 60 milliliters of blood per minute (mL/min/1.73m2). Beginning in 2007, plaintiffs level fell below 60 mL/min/1.73m2 and continued to decrease over the next five years until it was measured at 12 mL/min/1.73m2 in 2011.

 Even if there were a question of fact, it should be resolved by the jury, not by the trial court on a motion for summary disposition. See Kincaid v Cardwell, 300 Mich App 513, 523; 834 NW2d 122 (2013).

 In addition, despite the fact that defendants obtained an order to conduct ex parte meetings with plaintiffs physicians, the record con *629 tains no testimony or affidavits from any of these physicians indicating that before the September 20, 2012 conversation with Tayeb, they advised plaintiff that his kidney disease could or should have been recognized and treated years earlier by Mishra.

 “Natural history” is a medical term meaning the expected course of a disease absent treatment. See Merriam-Webster’s Collegiate Dictionary (11th ed). For example, whether kidney failure can occur suddenly or only over an extended period of time requires knowledge of the “natural history” of kidney disease.

 Our dissenting colleague suggests that any reasonable person would know that kidney failure must develop over a long period. She offers no grounds for such a conclusion. Moreover, her assertion is inconsistent with medical knowledge. Kidney failure can occur very quickly and has several possible causes, such as reduction in blood flow, allergic reaction, infection, adverse reaction to medication, dehydration, kidney stones, cancer, nerve damage, and others. See Mayo Clinic, Acute Kidney Failure: Causes <http://www.mayoclinic.org/diseases-conditions/kidney-failure-basics/causes/con-20024029> (accessed April 28, 2016) [https:// perma.cc/5MPK-RZBP]. And contrary to the dissent’s claim, we do not cite this medical text to justify plaintiffs belief; we do so to refute the dissent’s claim that plaintiffs belief was inconsistent with science and therefore unreasonable.

 The dissent suggests that plaintiff was told by Mishra that his blood tests were being done specifically due to concern about his kidneys and that after each test, Mishra assured plaintiff that his kidneys were fine. *633 However, this suggestion is not consistent with the record. As already noted, plaintiff testified that he was told only once, in late 2008, that his “kidney number” on a single blood test was a little high and that he was correctly advised that his follow-up ultrasound was normal. There is no testimony that Mishra thereafter discussed plaintiffs kidney health with him except in notifying him that his annual blood tests, which included many non-kidney tests, were normal. The dissent’s characterization of these communications as revealing to plaintiff that he had “elevated kidney levels” (i.e., plural) is inaccurate. (Emphasis added.) There is a substantial and striking difference between a single conversation three years before diagnosis and a subject of repeated discussion. Therefore, contrary to the dissent’s argument, the 2012 diagnosis was not “plainly contradictory to everything Dr. Mishra had said up until that point.” Mishra likely told plaintiff many things between 2008 and 2012. Regarding plaintiffs kidneys, there were but two conversations: one in 2008 referring to a mildly elevated test, and the accurate report of a normal kidney ultrasound in early 2009.

 The discovery rule does not incorporate the logical fallacy ofpost hoc, ergo propter hoc (after this, therefore because of this).

 Although plaintiffs kidney disease was diagnosed after he had undergone tests for kidney disease (among many other tests), it simply does not follow that the tests were related to his disease. More information was required to make that link, and that information was supplied by Tayeb.

 Plaintiff also challenges another ruling which we agree was erroneous. However, in light of our ruling, the issue appears to be moot. Before being deposed, plaintiff provided an affidavit to the trial court, averring, as he later did in his deposition, that he had spoken with Tayeb on September 20, 2012, and that, on that date, Tayeb informed him that had he been referred to a nephrologist earlier, he may have delayed or avoided his current state of renal failure and dialysis. More specifically, plaintiff averred that Tayeb stated that defendants’ failure to refer plaintiff to a nephrologist was inappropriate and was a serious contributor to plaintiffs medical condition. Plaintiff presented this affidavit in his brief addressing the timeliness of his claim. The trial court refused to consider the affidavit on the grounds that it was inadmissible hearsay. This ruling was erroneous as a matter of law given that the affidavit was not offered for the truth of the matter asserted by *636 the declarant. See People v Eggleston, 148 Mich App 494, 502; 384 NW2d 811 (1986) (holding that statements were not hearsay because they were not introduced to prove the truth of the matter asserted). Plaintiff did not offer the evidence to prove that defendants were negligent, and whether Tayeb’s alleged statements were accurate is not relevant to the present issue. Plaintiff relied on Tayeb’s alleged statement only to demonstrate how and why he became aware of his possible malpractice claim, not that Mishra was negligent or that his negligence was a proximate cause of any damages. The trial court therefore erred by ruling that the affidavit contained inadmissible hearsay for this purpose. See id.