# STATE OF MICHIGAN

# COURT OF APPEALS

PASQUALE SCIORTINO and KAREN
SCIORTINO,

        Plaintiffs-Appellants,

v

CHRISTOPHER NAJARIAN, D.O., DR. BLAKE
MILLER, CHRISTOPHER B. NAJARIAN, D.O.,
PC, and ST. JOHN MACOMB-OAKLAND
HOSPITAL,

        Defendants-Appellees,

and

MARK ALLEN, D.O., and ST. JOHN
PROVIDENCE HEALTH SYSTEM,

        Defendants.

UNPUBLISHED
August 29, 2017

No. 331892
Oakland Circuit Court
LC No. 2014-143756-NH

Before: FORT HOOD, P.J., and CAVANAGH and RONAYNE KRAUSE, JJ.

PER CURIAM.

        Plaintiffs,[1] appeal as of right from the trial court's order granting defendants'[2] motion for summary disposition in this medical malpractice action. We affirm.

---

[1] Plaintiff Karen Sciortino is Pasquale Sciortino's wife, and her claims against defendants stem from her loss of consortium. Accordingly, throughout this opinion, our reference to "plaintiff" will refer to plaintiff Pasquale Sciortino.

[2] In an order of dismissal entered April 15, 2015, defendant St. John Providence Health System was dismissed from this action without prejudice in the trial court. In a stipulated order of dismissal entered November 10, 2015, defendant Mark Allen D.O. was dismissed without prejudice from the proceedings in the trial court.

-1-

On appeal, plaintiff argues that the trial court erred in granting summary disposition in favor of defendants on the basis of the statute of limitations where factual issues existed with respect to when plaintiff discovered, or should have discovered, a possible cause of action against defendants. We disagree.

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *McLean v Dearborn*, 302 Mich App 68, 72; 836 NW2d 916 (2013). In *Frank v Linkner*, ___ Mich ___, ____; 894 NW2d 574 (2017) (Docket No. 151888); slip op at 5, the Michigan Supreme Court recently set forth the applicable standard for reviewing a trial court's decision on a motion brought pursuant to MCR 2.116(C)(7):

> Pursuant to MCR 2.116(C)(7), a party may move to dismiss a claim on the grounds that the claim is barred by the applicable statute of limitations. "The question whether a cause of action is barred by the applicable statute of limitations is one of law, which this Court reviews de novo. This Court also reviews de novo a trial court's decision regarding a summary disposition motion." *Seyburn, Kahn, Ginn, Bess, Deitch and Serlin, PC v Bakshi*, 483 Mich 345, 354; 771 NW2d 411 (2009). "In reviewing whether a motion under MCR 2.116(C)(7) was properly decided, we consider all documentary evidence and accept the complaint as factually accurate unless affidavits or other appropriate documents specifically contradict it." *Kuznar v Raksha Corp*, 481 Mich 169, 175-176; 750 NW2d 121 (2008).

MCL 600.5838a(2) sets forth the applicable statute of limitation for plaintiff's medical malpractice claim:

> Except as otherwise provided in this subsection, an action involving a claim based on medical malpractice may be commenced at any time within the applicable period prescribed in [MCL 600.5805] or [MCL 600.5851 to MCL 600.5856], *or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later.* [Footnotes omitted; emphasis added.]

The parties do not dispute that plaintiff did not commence his cause of action within the statutory two-year limitation period for medical malpractice actions. MCL 600.5838a(2); MCL 600.5805(6). Instead, at issue in this appeal is whether plaintiff commenced his medical malpractice action "within 6 months after . . . plaintiff discover[ed] or should have discovered the existence of [his] claim," as set forth in MCL 600.5838a(2).

In *Moll v Abbott Laboratories*, 444 Mich 1; 506 NW2d 816 (1993), the Michigan Supreme Court recognized the following principles of law with respect to the application of what has come to be known as "the discovery rule."

> We hold that under the discovery rule, the statute of limitations begins to run when the plaintiff discovers, or through the exercise of reasonable diligence, should have discovered a possible cause of action. Furthermore, we hold that in the absence of disputed facts, the question whether a plaintiff's cause of action is

-2-

barred by the statute of limitations is a question of law, to be determined by the trial judge. [*Id*. at 29.]

While recognizing that whether a plaintiff "knows" of a possible cause of action, is a "subjective standard," the *Moll* Court also determined that whether a plaintiff "should have known" of a possible cause of action "is an objective standard based on an examination of the surrounding circumstances." *Id*. at 17-18. The *Moll* Court also quoted its earlier decision in *Bigelow v Walraven*, 392 Mich 566, 576; 221 NW2d 328 (1974), in articulating the policies underlying the statute of limitations:

> Statutes of limitations are intended to "compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend"; "to relieve a court system from dealing with 'stale' claims, where the facts in dispute occurred so long ago that evidence was either forgotten or manufactured"; and to protect "potential defendants from protracted fear of litigation." [*Moll*, 444 Mich at 14.]

In *Solowy v Oakwood Hosp Corp*, 454 Mich 214, 222-223; 561 NW2d 843 (1997), the Michigan Supreme Court recognized that "[t]he rationale of *Moll* applies equally to malpractice claims, whether legal or medical." Specifically, the *Solowy* Court held that "[o]nce a plaintiff is aware of an injury and its possible cause, the plaintiff is equipped with the necessary knowledge to preserve and diligently pursue his claim." *Id*. at 223. While recognizing that a plaintiff does not have to be able to prove every element of the cause of action before the statute of limitations is implicated, the *Solowy* Court also clarified that the "'possible cause of action' standard" does not require the plaintiff to be aware that his or her injury was even in fact caused, or likely caused by his or her physician's alleged omissions or mistake. *Id*. at 224. The *Solowy* Court instructed that lower courts ought to follow a "flexible approach," in applying the possible cause of action standard, and described this approach, in pertinent part, as follows:

> In applying this flexible approach, courts should consider the totality of information available to the plaintiff, including his own observations of physical discomfort and appearance, his familiarity with the condition through past experience or otherwise, and his physician's explanations of possible causes or diagnoses of his condition. [*Id*. at 227 (footnote omitted).]

The "possible cause of action" standard is to be applied with "a substantial degree of flexibility[,]" and lower courts must remain guided by "the doctrine of reasonableness and the standard of due diligence . . . [.]" *Id*. at 230. The *Solowy* Court also cautioned lower courts to take care to apply the "possible cause of action" standard in a manner that furthers the "legitimate legislative purposes behind the rather stringent medical malpractice limitation provisions . . . [.]" *Id*. Additionally, in *Solowy*, the Court expressly held that where there are no factual disputes regarding when the plaintiff discovered, or ought to have discovered, the cause of action, the determination whether the cause of action is barred by the applicable statute of limitations is a question of law left to the trial court. *Id*. at 230. In sum, the *Solowy* Court held, in pertinent part, as follows:

The six-month discovery rule period begins to run in medical malpractice cases when the plaintiff, on the basis of objective facts, is aware of a possible cause of action. This occurs when the plaintiff is aware of an injury and a possible causal link between the injury and an act or omission of the physician. When the cause of the plaintiff's injury is difficult to determine because of a delay in diagnosis, the "possible cause of action" standard should be applied with a substantial degree of flexibility. In such cases, courts should be guided by the doctrine of reasonableness and the standard of due diligence, and must consider the totality of information available to the plaintiff concerning the injury and its possible causes. [*Id*. at 232.]

Recently, in *Jendrusina v Mishra*, 316 Mich App 621, 624; 892 NW2d 423 (2016), this Court reviewed the statutory language of MCL 600.5838a(2), providing that "an action involving a claim based on medical malpractice may be commenced . . . within 6 months after the plaintiff discovers or *should have* discovered the existence of the claim . . . ." This Court reasoned that the trial court in *Jendrusina* erred when it substituted the language "*could have*" for "*should have*" in the statutory language. *Jendrusina*, 316 Mich App at 624. After reviewing the dictionary definitions of the words "could" and "should[,]" this Court determined, in pertinent part, as follows:

Therefore, the inquiry is not whether it was *possible* for a reasonable lay person to have discovered the existence of the claim; rather, the inquiry is whether it was *probable* that a reasonable lay person would have discovered the existence of the claim. [*Id*. at 626.]

The *Jendrusina* Court cited language from *Solowy* that "[t]he discovery rule period begins to run when, on the basis of objective facts, the plaintiff should have known of a possible cause of action." *Id*. at 631, citing *Solowy*, 454 Mich at 222. The *Jendrusina* Court further clarified that "[a]n objective standard, however turns on what a reasonable, ordinary person would know, not what a reasonable physician (or medical malpractice attorney) would know." *Id*.

In determining whether plaintiff knew, or should have known, of his possible medical malpractice cause of action six months before he commenced his cause of action, a review of his deposition testimony is instructive. Specifically, defense counsel questioned plaintiff during his deposition regarding any conversations he may have had with his primary care physician, Dr. Erwin Feldman, D.O., in the spring of 2013 regarding his December 8, 2011 surgery.

*Q*. Did Dr. Feldman ever tell you that he also got a copy of Dr. Najarian's operative report, and – well, let me just ask that much. Did Dr. Feldman ever discuss with you that he was aware that there had been an intraoperative complication that was repaired?

*A*. The only thing, when I went back, -- first I went to therapy for two months.

*Q*. Right. Actually, I think three.

*A.* Well, whatever. So [Dr. Najarian] put something on here (indicating), put a cast on. And this right here (indicating), the bone was showing. So the people at therapy said go back to the doctor, he has to fix this up, you're going to lose your finger. So what they did, [Dr. Najarian] cut a little farther back, whatever, so it won't drag on the finger. And then I went back twice to him to say, Doc, I can't move my finger, something is wrong with my hand. [Dr. Najarian] said, well, wait until it shuts closed [sic] and then come back to me.

*Q.* Okay.

*A.* I said, what about the pain. [Dr. Najarian] said take a couple of Advil, whatever, you know.

So what I did, I went back to [Dr. Feldman]. I said, Dr. Feldman, what's going on here? He said, Pat, I'm sorry to say this about the guy [Dr. Najarian], I thought [Dr. Najarian] know his job [sic], but you know something, you're not the first guy complaining to me. You are the second or third guy who come and say [Dr. Najarian] messed up. Dr. Feldman, why do you send me over there for [sic]?

*Q.* Did Dr. Feldman, when you had that conversation, did he say he had reviewed the operative report and he saw that there had been a complication?

*A.* No, he don't say [sic] nothing like that to me. I don't know if he did or not, I'm not sure.

*Q.* Did he ever say anything more specific about how he knew [Dr. Najarian] had messed up?

*A.* [Dr. Feldman] sent me to another doctor to do the operation. Dr. Feldman said, well, I am not going to send you back to [Dr. Najarian], I will send you somewhere else.

*Q.* And that was Dr. [Paul] Shapiro?

*A.* Dr. Shapiro.

Plaintiff went on to testify that Dr. Shapiro told him and his daughter, Maria Aiello, following the December 11, 2013 surgery that he performed that he was unable to repair "what [Dr. Najarian] messed up." Specifically, according to plaintiff, Dr. Shapiro told him, on an unspecified date following the December 11, 2013 surgery when he went to have his stitches removed, the following, in pertinent part:

So when I went back to take the stitches out and all that, [Dr. Shapiro] told me, he says, I can't do nothing for you. I said, fix it, do something. [Dr. Shapiro] said, leave it, it is what it is. Whatever [Dr. Najarian] messed up, [Dr. Shapiro] could not fix it. [Dr. Shapiro] cannot fix what [Dr. Najarian] messed up.

Plaintiff also acknowledged that at Dr. Shapiro's request, on April 24, 2013, he went to Dr. Najarian's office to pick up a copy of his operative report from the December 8, 2011 surgery, as well as a copy of his electromyography (EMG). When questioned by defense counsel if the family member who accompanied him to pick up the documents from Dr. Najarian's office read the documents, plaintiff responded, "[n]o, nobody read nothing." After providing the documents from Dr. Najarian's office to Dr. Shapiro on May 28, 2013, plaintiff denied discussing with Dr. Shapiro the contents of the documents. According to plaintiff, "I don't understand what the [documentation from Dr. Najarian's office] says. You know, I don't know." Defense counsel continued to question plaintiff as follows:

> Q. But when you had that visit with Dr. Shapiro in May of 2013, did you discuss what had gone on with you and what the plan was?
>
> A. Yeah. After Dr. Feldman set up the appointment with Dr. Shapiro, then I went to [Dr. Shapiro's] office, and I tell [Dr. Shapiro], you know. I says [sic], my hand now, -- I went over there to help me out, I said [Dr. Najarian] ruined me. I can't do this and that. And [Dr. Shapiro] said, well, I could fix it. Okay, if you can fix it, then do it.

Plaintiff continued to testify that Dr. Shapiro recommended another operation for him, and conducted what appears from the record to be testing of his nerves. Specifically, plaintiff stated, with regard to visiting Dr. Shapiro for a second opinion:

> But you know, I want to fix my hand and I went through whatever it is. I tried to see if they could fix my problem, you know.

Defense counsel also questioned plaintiff regarding when he first heard about the complication that took place during the December 8, 2011 surgery:

> Q. Is the first time that you heard about what Dr. Najarian had done during his surgery was after your December [2013] surgery, on December 13th,[3] or had Dr. Shapiro told you about that earlier at the April or May visit?
>
> A. That [Dr. Najarian] messed up?
>
> Q. Yes.
>
> A. Yes, because see, I don't know – the only thing I know, [Dr. Najarian] messed me up; the pain, the aggravation. I went to therapy, I did exactly what [Dr. Najarian] wanted me to do, nothing happened. I got worse. So I went to his office. I said, hey, Doc.
>
> Q. Whose office, Najarian or Shapiro?

---

[3] Plaintiff's surgery with Dr. Shapiro actually took place on December 11, 2013.

*A*. Not Shapiro, the other guy.

*Q*. Najarian?

*A*. Najarian. I said, look, Doc. So what he did, he went in the back room. He put something in his hand sharp, with a needle sticking up. So [Dr. Najarian] said, let me see your hand, and he was poking me with a sharp thing.

*Q*. Okay.

*A*. I said, Doctor, you are poking me, but I don't feel nothing. [Dr. Najarian] says, I am poking you. I said, I saw that thing in your hand. So you were poking me with a sharp object or whatever it was to make sure to see, because [Dr. Najarian] wasn't sure enough of what's going on.

*Q*. Okay. So it sounds like, and correct me if I am misunderstanding you, that shortly after the surgery by Dr. Najarian, you felt something had been done wrong?

*A*. No, I went to therapy. I thought if I go to therapy, -- [Dr. Najarian] recommend therapy, I went to the therapy, because I thought therapy would make my hand better, all my problems will go away. This was after therapy, then I started to see that nothing move, nothing – it got worse.[4]

*Q*. And when did you start having those thoughts?

*A*. As soon as I got done with therapy, you know, within a month, within a week, whatever, you know, nothing is going on. And first I went to see Dr. Feldman, and then I went back to [Dr. Feldman], what's going on?

*Q*. And when you went back to Dr. Feldman, Dr. Feldman said you are not the first person who has complained about –

*A*. No, [Dr. Feldman] apologized to me for sending me over there [to Dr. Najarian]. [Dr. Feldman] said, you're not the first guy [Dr. Najarian] messed up.

*Q*. So then [Dr. Feldman] recommended that you see Dr. Shapiro?

*A*. Correct [(footnotes added).]

When questioned by defense counsel if Dr. Shapiro had seemed concerned about the December 8, 2011 surgery before he operated on plaintiff himself on December 11, 2013, the following colloquy occurred:

---

[4] According to the record, Dr. Najarian discharged plaintiff from physical therapy on March 1, 2012.

*Q.* Before Dr. Shapiro cut you open and looked at the nerve, had [Dr.] Shapiro ever made any other comments to you that were critical of Dr. Najarian, even before he went in there and looked around?

*A.* Yeah, [Dr. Shapiro] say [sic] it don't [sic] seem right. I don't know, [Dr. Shapiro] says. I don't know what – [Dr. Shapiro] said, I can't see what the problem is, but we got to find out. I don't know, I don't remember exactly what the conversation was. You know, so I'm not sure what [Dr. Shapiro] was saying to me.

According to plaintiff, he waited until December 11, 2013 to have his second surgery after his visit with Dr. Shapiro on May 28, 2013 because Dr. Najarian had told him, in response to concerns he apparently voiced to Dr. Najarian, "don't worry, eventually you are going to be better. Eventually you are going to feel better, this is going to go away." Specifically, plaintiff testified:

Because I went to [Dr. Najarian], and I said, hey, Doc, here, I am losing my hand. [Dr. Najarian] said, don't worry about it, we did a good job, telling me [Dr. Najarian] did a good job, and with time it gets better and you will be all right. So I wait and I wait, and in the meantime I go to [Dr. Feldman]. He give me a pain shot, he give me some heavy medication, bothers my stomach, stomach upset. So I take Advil before I go to bed, because otherwise, I can't sleep. And I wait, and then all of a sudden, I said, Doc, -- Dr. Feldman, -- I said, Doc, this guy [Dr. Najarian] is taking me for a ride, come on. [Dr. Feldman] said, hey, I'm sorry I sent you to the guy. He says, I couldn't believe I sent you for this . . . .

Finally, plaintiff reiterated that immediately following his December 8, 2011 surgery, and in follow up visits with Dr. Najarian, Dr. Najarian never told him that his ulnar nerve had been transected during surgery.

As set forth in *Moll*, the question whether plaintiff "should have known" of his possible cause of action is determined using an objective standard, considering the surrounding circumstances. *Moll*, 444 Mich at 17-18. Similarly, in *Solowy*, the Michigan Supreme Court instructed that once a plaintiff is aware of a potential injury and its possible cause, the onus falls on the plaintiff to diligently pursue his claim and preserve his legal rights. *Solowy*, 454 Mich at 223. A close review of plaintiff's deposition testimony reveals that plaintiff, by his own admission, was aware that there was a problem with his hand shortly following his December 8, 2011, surgery and after he completed physical therapy, and he in fact confronted and questioned Dr. Najarian about his concerns. By plaintiff's own admission, he consulted with Dr. Feldman in the spring of 2013, and expressed his concerns about his hand following the surgery, and he and Dr. Feldman had a conversation about how Dr. Najarian had mishandled the matter. It was at that point that plaintiff was referred to another physician, Dr. Shapiro, with his first visit taking place on April 16, 2013. Plaintiff also acknowledged in his deposition testimony that at Dr. Shapiro's request he returned to Dr. Najarian's office on April 24, 2013 to obtain a copy of his operative note, which included information regarding the complication that took place during his December 8, 2011 surgery. By his own admission, during a conversation with Dr. Shapiro during one of his initial visits, plaintiff informed Dr. Shapiro that Dr. Najarian "ruined

[plaintiff]." While plaintiff argues on appeal that there are factual disputes with respect to when he became aware of a possible medical malpractice action, a thorough review of his own deposition testimony simply belies this claim. Put another way, plaintiff's own words confirm that he was aware he was experiencing physical discomfort and pain and lack of progress following the December 8, 2011 surgery, he first discussed his concerns with Dr. Najarian, and unsatisfied, he returned to Dr. Feldman, who sent him to another physician. *Solowy*, 454 Mich at 227. The record evidence also confirms that plaintiff was having serious misgivings regarding Dr. Najarian's course of treatment for his hand, discussing his concerns with both Dr. Feldman and Dr. Shapiro. Thus, the record evidence strongly confirmed a nexus between the December 8, 2011 surgery, and the pain and discomfort that plaintiff was experiencing for a significant period of time afterward. *Id.* at 226. Specifically, while factual disputes may exist concerning what plaintiff and his son, Nick Sciortino, were told immediately following his December 8, 2011 surgery regarding whether a complication occurred during surgery, plaintiff's deposition testimony unequivocally confirms that in the early months following his December 8, 2011 surgery, plaintiff was concerned about the outcome of the December 8, 2011 surgery, and had a conversation with Dr. Najarian about it. Additionally, during the spring of 2013, plaintiff saw Dr. Feldman and Dr. Shapiro and discussed his concerns about Dr. Najarian's performance. Accordingly, using an objective standard and duly considering the surrounding circumstances, we conclude that the record evidence confirms that plaintiff should have known of the potential existence of his claim more than six months before his notice of intent was filed in April 2014. *Moll*, 444 Mich at 17-18.

We acknowledge that plaintiff points to the affidavit of Dr. Feldman, included in support of his motion for reconsideration, asserting that it demonstrates that factual disputes existed with regard to whether plaintiff had a conversation with Dr. Feldman about Dr. Najarian's treatment of plaintiff's hand. As an initial matter, it was within the trial court's discretion to decline to consider this affidavit where it could have been presented during the summary disposition proceedings. *Yachcik v Yachcik*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 333834); slip op at 10. While Dr. Feldman averred that he "never informed plaintiff that Dr. Najarian had transected [plaintiff's] ulnar nerve or committed malpractice[,]" he also noted that he documented in his file that plaintiff informed him on March 26, 2013 that he needed surgery on his right hand. While Dr. Feldman also averred that he had no reason to believe that a "surgical mishap" had taken place during the December 8, 2011 surgery, plaintiff himself testified at length during his deposition about conversations with Dr. Feldman in which plaintiff shared his concerns regarding the outcome of the December 8, 2011 surgery, and the pain and discomfort that he was experiencing. Even setting aside Dr. Feldman's alleged comments regarding whether Dr. Najarian mishandled the December 8, 2011 surgery, plaintiff's concerns and complaints voiced to Dr. Feldman, viewed with an objective standard against the surrounding circumstances, establish that plaintiff knew, or should have known, about a possible cause of action for medical malpractice. *Moll*, 444 Mich at 18; *Solowy*, 454 Mich at 216, 222. Put another way, the record evidence is clear that plaintiff was aware of an injury to his hand, and that its possible cause was the December 8, 2011 surgery. *Solowy*, 454 Mich at 222, citing *Moll*, 444 Mich at 23-24.

The present case is also distinguishable from *Jendrusina*. In that case, the plaintiff, diagnosed following an emergency room visit with kidney failure, alleged that the defendant physician violated a duty of care to him by not referring him to a kidney specialist. *Jendrusina*,

316 Mich App at 624. This Court determined that while testing with the defendant physician demonstrated that plaintiff was experiencing "abnormal and worsening levels of two blood measures related to kidney functions[,]" for quite some time, the record evidence did not establish that the plaintiff was aware of the "increasingly abnormal indications of kidney disease[,]" or that he should have known of a possible medical malpractice claim. *Id*. at 627, 628, 630, 632, 634, 635. In contrast, the record in this case is replete with evidence that "on the basis of objective facts, [plaintiff] should have known of a possible cause of action." *Solowy*, 454 Mich at 222. Therefore, the trial court properly concluded that summary disposition was warranted pursuant to MCR 2.116(C)(7).[5]

Affirmed. Defendants, as the prevailing parties, may tax costs pursuant to MCR 7.219.

/s/ Karen M. Fort Hood
/s/ Mark J. Cavanagh

---

[5] While presented as an issue in his statement of the issues on appeal, plaintiff does not present any argument in his brief on appeal in support of his assertion that the trial court erred in denying his motion for reconsideration. Accordingly, this issue is waived. *Houghton v Keeler*, 256 Mich App 336, 339-340; 662 NW2d 854 (2003).