*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ZANETTA HUTCHINSON,

Plaintiff-Appellant,

v

INGHAM COUNTY HEALTH DEPARTMENT,
CAROL SALISBURY, N.P., and PETER
GULICK, D.O.,

Defendants-Appellees.

FOR PUBLICATION
May 9, 2019
9:00 a.m.

No. 341249
Ingham Circuit Court
LC No. 16-000453-NH

Before: BOONSTRA, P.J., and METER and FORT HOOD, JJ.

FORT HOOD, J.

In this medical malpractice case, plaintiff Zanetta Hutchinson appeals by delayed leave granted[1] the trial court's order granting summary disposition in favor of defendants Ingham County Health Department, Carol Salisbury, N.P., and Peter Gulick, D.O., pursuant to MCR 2.116(C)(7). For the reasons set forth in this opinion, we reverse and remand for proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

In her first amended complaint, plaintiff, a 43-year-old single mother of a young child, unemployed and receiving Social Security disability benefits, alleged that she was a patient of the Ingham County Health Department and was treated by Salisbury, a nurse practitioner, and Dr. Gulick, a physician specializing in internal medicine.[2] Plaintiff further alleged that when she informed Salisbury that she had a lump in her left breast in the late summer of 2013, Salisbury, supervised by Gulick, ordered a mammogram for plaintiff, and a mammogram was performed on

---

[1] *Hutchinson v Ingham Co Health Dep't*, unpublished order of the Court of Appeals, entered June 26, 2018 (Docket No. 341249).

[2] Dr. Gulick, according to the record, is also a board-certified infectious disease physician.

September 4, 2013. Plaintiff's first amended complaint alleged that she underwent a "MAMMO SCREEN DIGITAL W CAD PANEL BILAT" at Sparrow Health System, and that the radiologist, Alfredo P. La Fe M.D., stated with regard to the results:

> The tissue of both breasts is heterogeneously dense. This may lower the sensitivity of mammography. . . . There is a benign appearing calcification in the right breast. There are also benign appearing calcifications in the left breast. No significant masses, calcifications or other finding [sic] are seen in either breast.

According to the first amended complaint, Dr. Gulick reviewed and "electronically signed" the mammogram results on September 5, 2013. Plaintiff alleged that Dr. Gulick was negligent in not providing appropriate care and treatment to plaintiff by not monitoring and managing her treatment properly when she complained of a lump in her breast, and by not ordering a diagnostic mammogram for plaintiff as opposed to a screening mammogram. Specifically, plaintiff alleged, among other things, that Dr. Gulick ought to have ordered a biopsy performed on plaintiff once her mammogram showed "suspicious calcifications in her left breast" and that Dr. Gulick was negligent in his supervision of Salisbury. Plaintiff made similar allegations against Salisbury, and alleged that Salisbury failed to ensure that "[plaintiff's] physician [was] properly informed of [her] breast complaints and mammogram results[.]"[3] After plaintiff moved to Arkansas in 2014, she sought medical care at the University of Arkansas for Medical Sciences (UAMS). On June 1, 2015, a mammogram of plaintiff's left breast was performed, and following a June 9, 2015 biopsy, plaintiff was diagnosed with breast cancer on June 15, 2015. The parties do not dispute that plaintiff mailed her notice of intent in this case on December 4, 2015. MCL 600.2912b(1), (2).

In her deposition in this case, plaintiff recalled that in August of 2013, she attended an appointment with Salisbury, and Salisbury ordered a mammogram for plaintiff after feeling a knot in plaintiff's left breast. According to plaintiff, the knot she described "was never tender, . . . it never hurt; it was just growing." While plaintiff would do her own monthly breast exams, it was her partner at the time that discovered the knot in her left breast. In plaintiff's words, her partner observed "a small-like pea shaped knot in [her] left breast." Plaintiff described that during her initial visit with Salisbury[4] concerning the lump in her left breast, "[Salisbury] had me lay back, and she did the breast exam and she felt the lump." After Salisbury felt the lump, plaintiff recalled that "[Salisbury] said that we would do a mammogram." Plaintiff denied that she felt any pain or tenderness when Salisbury was examining the lump. Plaintiff further described the ensuing events as follows:

> So I went to [Sparrow Hospital] and I did the mammogram as scheduled and waited on the results to come back. So at my next checkup appointment,

---

[3] Plaintiff's three-count first amended complaint alleged medical negligence against Dr. Gulick, Salisbury and the Ingham County Health Department.

[4] While plaintiff could not recall the exact date of the appointment, it appears from the record that it took place on August 28, 2013.

[Salisbury] told me that it was calcifications from me delivering my son late at 40. And they don't prescribe dry up breast milk pills anymore, so that's what she told me at 40. So I took her word as what it was. I know no different. I'm not a doctor.

According to plaintiff, she had her mammogram on September 4, 2013. At the time that she had her mammogram, plaintiff was not experiencing pain, tenderness or discharge from her left breast. Plaintiff did not discuss her mammogram results with Dr. Gulick because he was not "the doctor that actually [was assigned] to be [administrator]; [Salisbury] was." According to the records of the Ingham County Health Department, plaintiff did not return to see Salisbury following her mammogram until November of 2013, but plaintiff could not independently recall the date of her follow-up appointment with Salisbury. However, plaintiff was adamant during her deposition testimony that Salisbury informed her that the lump in her breast "was just calcifications." Plaintiff testified that she was eager to follow up with Salisbury following her mammogram because "I wanted to know what the results were for the lump because the lump was still in my breast growing; it was getting bigger, and I wanted to know what it was."

Following her September 4, 2013 mammogram, plaintiff continued to conduct her own self-examinations of her left breast, and the following colloquy took place between plaintiff and defense counsel on this subject:

> *Q*. And you continued to do monthly self-exams?
>
> *A*. Right. I continued to feel the knot every day.
>
> *Q*. So at this point, you weren't doing it monthly, you're doing it daily?
>
> *A*. Yeah. I am, like, touching that spot every day.
>
> *Q*. And it was actually getting bigger?
>
> *A*. Yeah.
>
> *Q*. So between September, when you had the mammogram, and November, which would've been the next time that you actually saw NP Salisbury, every day you noticed this lump and you noticed it was actually getting bigger?
>
> *A*. Well, right. When I did see [Salisbury] again, the knot had gotten bigger. And she felt it, and she said, "Yes. But it does seem to be bigger, but it's still – I just think it's calcifications because you had a baby at 40, and they don't give breastmilk pills anymore." So you know? What can I say? I'm not a doctor. I had to take her word for it.

While plaintiff could not recall the exact specifics of her conversation with Salisbury during the appointment in which they discussed the results of her September 4, 2013 mammogram, she was very clear that Salisbury told her that the lump in her left breast was "calcifications." Plaintiff also recalled that Salisbury told her that her breast tissue was dense,

that the lump was benign, and that made it difficult for "them to actually view what exactly [the lump] was." Plaintiff did not have any follow-up treatment with regard to the lump. Plaintiff denied that Salisbury informed her that she should return for a repeat mammogram in a year. In plaintiff's words, "[t]hey ruled it as calcifications, and they left it at that. And the lump continued to grow, and I continued to show her. They never did nothing else other than what they had did [sic]."

Plaintiff saw Salisbury three more times before she moved to Arkansas on an unspecified date in 2014. Each time, plaintiff told Salisbury that the lump was getting bigger, and Salisbury would feel the lump but "[Salisbury] did nothing." According to plaintiff, Salisbury acknowledged during their appointments that the lump did appear to be growing. Plaintiff did not do any independent research on the subject of calcifications, she did not talk to anyone else about the lump in her breast and she did not consult with any other doctors about the issue. While the lump continued to grow, plaintiff did not experience any tenderness, pain or discharge. Plaintiff saw Dr. Gulick on February 14, 2014, for a reason unrelated to the lump in her breast but they did not discuss the lump in her breast or her mammogram results.

After plaintiff moved to Little Rock, Arkansas, she began to treat with Dr. Moses[5] and during her first appointment on May 1, 2015, plaintiff told Dr. Moses about the lump in her breast and Dr. Moses ordered a mammogram. Plaintiff described the first appointment with Dr. Moses as follows:

> Well, [Dr. Moses] did the breast exam, and she noticed the mass; and that is what she called it. And she said that she was unsure and got a little worried about that. And it was pretty big, and she wanted to get it checked out. So she referred me for a mammogram, and they took it from there.

According to the record, plaintiff's last appointment with Salisbury was in June of 2014, and she did not consult with any other doctors before seeing Dr. Moses on May 1, 2015. Defense counsel continued to question plaintiff as follows regarding her initial visit with Dr. Moses in Little Rock:

> *Q*. And did [Dr. Moses] tell you what she was worried about?
>
> *A*. Not exactly. Just that the mass was – how big the mass was. She wanted to see what it was because it was kind of huge for my little breast. It was a pretty big tumor in there.
>
> *Q*. Okay. Did she say to you that she was concerned it might be breast cancer?
>
> *A*. No, she didn't say that. She just said she was concerned and she wanted to see what it was.

---

[5] Dr. Moses' first name is not discernible from the record.

*Q*. Were you concerned that it might be breast cancer?

*A*. I was concerned that it could've been anything; you know?

*Q*. Was cancer one of the things you were concerned about?

*A*. Well, yeah. It don't [sic] run in my family in the girls, but yeah; you know?

*Q*. Just living in our society that is something you're aware of?

*A*. Yeah.

Between her last appointment with Salisbury and her first appointment with Dr. Moses, plaintiff continued to feel the lump in her left breast on a daily basis and observed that it continued to grow. When defense counsel asked plaintiff if she was concerned if it was breast cancer, plaintiff answered in the following manner:

> Actually, I didn't know what to think it was. I just assumed it was what they said it was, but I knew it was getting bigger. And I don't, I'm not a doctor, but I didn't think calcification pockets grow like that. So, I mean, common sense, you would think it was something else. You would be alarmed, so yeah. I was scared it could've been something serious as it was, and it was. So . . . .

However, subsequently during her deposition, during questioning by her own counsel, plaintiff stated that because she was informed that the lump was a calcification by Salisbury, she was not particularly worried about the lump. Plaintiff had her mammogram on June 1, 2015. After more photographs were ordered, according to plaintiff on an unspecified date[6] plaintiff was told by Dr. Frost,[7] a radiologist, that she would need a biopsy. Plaintiff testified that Dr. Frost told her that a biopsy was necessary "[b]ecause of the mass, the size of the mass, and they wanted to be sure of what it was because it was actually was [sic] formed in my milk ducts in my breast." Plaintiff testified further regarding the substance of her communications with Dr. Frost:

*Q*. Did they say to you that they were concerned [the lump] could be cancerous?

*A*. Yes, she did.

*Q*. And because there was a concern that it could be cancerous, she wanted you to actually have a biopsy to find out what it exactly is?

---

[6] In their brief on appeal, defendants Ingham County Health Department and Salisbury "concede that the exact date on which Plaintiff was informed of the mammogram result is unknown."

[7] Dr. Frost's first name is not discernible from the record.

*A*. Exactly.

Plaintiff's deposition testimony continued, in pertinent part:

*Q*. And it looks like you had the biopsy on June 9?

*A*. That sounds about right.

*Q*. So it was pretty quickly after you had the mammogram that you talked to Dr. Frost?

*A*. Right.

*Q*. And she said, "This could be cancer. We need to do a biopsy. We need to find out what's going on?"

*A*. Right.

Plaintiff received her biopsy results on June 15, 2015 and was diagnosed with breast cancer. Specifically, plaintiff was diagnosed with "[i]nvasive ductal carcinoma[ ]" and "[l]ymphvascular invasion [was] identified." Plaintiff was also informed she would need chemotherapy, radiation and that her left breast would need to be removed because the tumor was 10 cm in diameter and "had wrecked a lot of [her] breast tissue." Plaintiff opted to have a double mastectomy for preventative reasons. Plaintiff also testified that she has Medicaid for her medical coverage and that once she arrived in Arkansas she had to wait a 45-day waiting period for coverage. At the time of her deposition, plaintiff's cancer was in remission. Plaintiff testified that she did not discuss the lump in her breast during an appointment subsequent to the September 4, 2013 mammogram with an obstetrician-gynecologist at the Ingham County Health Department for the following reasons:

I believed in what [Salisbury] was telling me it was what it was. I – you know, I had no reason to question their capabilities. I'm not a doctor. I don't know. So I believed what they were telling me until it's started [sic] [the lump] kept growing.

As relevant to this appeal, Dr. Gulick filed a motion for summary disposition pursuant to MCR 2.116(C)(7), arguing that plaintiff's claims were barred by the six-month discovery rule. Specifically, Dr. Gulick contended that, based on precedent from the Michigan Supreme Court, *Solowy v Oakwood Hosp Corp*, 454 Mich 214; 561 NW2d 843 (1997), plaintiff was aware of her possible cause of action, and the limitation period began to run no later than June 1, 2015. In support of his motion, Dr. Gulick pointed out that plaintiff testified during her deposition that during the time period spanning 2013 to 2014, she was continually performing daily self-exams of her left breast, she noticed that the lump was growing in size and she was concerned that the lump could be something more serious than a calcification. According to Dr. Gulick, "[p]laintiff had sufficient suspicions in 2013 and 2014 that perhaps she needed additional testing to rule out cancer. These suspicions were sufficient to trigger the discovery rule." Dr. Gulick also noted that plaintiff testified that following a June 1, 2015 mammogram, she was informed by Dr. Frost that she would require a follow-up biopsy "because of the likelihood that the lump was cancer." Specifically, Dr. Gulick claimed that because plaintiff was informed on June 1, 2015 that the

lump in her breast may be cancerous, she discovered the existence of her possible claim as of June 1, 2015, and therefore, pursuant to MCL 600.5838a(2), the six-month limitation period expired on November 30, 2015. Because plaintiff's notice of intent was not filed until December 4, 2015, Dr. Gulick asserted that her claim was time-barred.

In her response to Dr. Gulick's motion, plaintiff denied that she could have discovered her possible cause of action in 2013 or 2014 as she was informed by Salisbury that the lump in her left breast was benign, even after informing Salisbury that the lump was continuing to grow. Instead, plaintiff argued that the six-month discovery period began on June 9, 2015,[8] when she received biopsy results and she was diagnosed with breast cancer. Notably, plaintiff disagreed with Dr. Gulick's assertion that she should have been aware of her possible cause of action on June 1, 2015 when she was informed that her mammogram was "suspicious for cancer." Specifically, plaintiff claimed that the present case was factually distinguishable from *Solowy* because the plaintiff in *Solowy* had already been diagnosed with cancer and was familiar with its symptoms when it reoccurred. Plaintiff also claimed that even though she was diagnosed with breast cancer on June 9, 2015, she was not aware of a possible connection between the alleged malpractice of Salisbury, Dr. Gulick and the Ingham County Health Department until June 15, 2015, "when [plaintiff] was informed [by her medical providers in Arkansas] that the 2013 mammogram should have prompted follow up screening." Reiterating that her claim was filed in a timely manner given that the six-month discovery period did not begin to run until June 9, 2015, plaintiff requested that the trial court deny Dr. Gulick's motion for summary disposition.

Plaintiff also filed a supplemental response to defendant's motion in which she attached her September 27, 2017 affidavit. In her affidavit, plaintiff averred as follows:

1. After my mammogram in September 2013, I repeatedly informed Carol Salisbury, N.P., that the lump in my left breast was continuing to grow. Each time I spoke to Ms. Salisbury regarding the lump, she assured me that the lump was just a benign calcification.

2. After I stopped treating with Ms. Salisbury, I continued to rely on her assurances that, despite the fact the lump was growing, it was a benign calcification.

3. I have no medical training or specialized medical knowledge, and trusted that Ms. Salisbury had been correct when she repeatedly assured me that the lump was a benign calcification.

4. I had a mammogram performed on June 1, 2015, after which I was told the scan was suspicious for cancer in my left breast, and that I would need to have a biopsy performed to determine whether I actually had breast cancer.

---

[8] The record reflects that plaintiff received her biopsy results and was informed she had breast cancer on June 15, 2015.

5. I only became aware that I did in fact have breast cancer after the biopsy was performed on June 9, 2015.

6. I learned that I had a possible malpractice claim on approximately June 15, 2015, after I was informed by my treating physicians that the findings on the 2013 mammogram should have prompted additional scans and a biopsy.

In reply, Dr. Gulick argued that the language of MCL 600.5838a(2) required plaintiff to initiate her lawsuit within six months after she discovered or should have discovered the existence of her claim, whichever occurred later, and that the statute did not require that plaintiff have "actual" knowledge of her claim, including injury and causation. Dr. Gulick also asserted that even though plaintiff was not a medical doctor, given that she testified in her deposition that the lump in her breast continued to grow and that she was concerned it was cancer, she had a duty to follow up on her suspicions that the lump could be cancerous. Accordingly, Dr. Gulick reiterated his arguments that plaintiff should have discovered her possible cause of action as early as 2013 or 2014 or at the latest, on June 1, 2015, when she was informed that the lump was being tested for cancer.

Following a hearing on defendants' motion, the trial court, ruling from the bench, concluded that plaintiff should have discovered her possible cause of action in 2013 or 2014, or, at the latest, when she was informed by Dr. Frost that a biopsy was necessary as the lump could be cancerous. The trial court concluded that plaintiff's cause of action was time-barred as a result. Plaintiff now appeals by delayed leave granted.

## II. STANDARD OF REVIEW

This Court reviews de novo the trial court's ruling on a motion brought pursuant to MCR 2.116(C)(7) determining that an action is barred by the applicable statute of limitations. *Township of Fraser v Haney*, ___ Mich App ___, ____; ___ NW2d ___ (2018) (Docket No. 337842); slip op at 2.

In reviewing the trial court's ruling that a claim is barred by the applicable statute of limitations, the following legal principles are of guidance:

> this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate. [*Id.*; slip op at 2-3, quoting *Dextrom v Wexford Co*, 287 Mich App 406, 429; 789 NW2d 211 (2010) (citations omitted in original).]

## III. ANALYSIS

-8-

The thrust of plaintiff's argument on appeal is that the trial court erred in granting summary disposition in favor of defendants on the basis of its conclusion that plaintiff should have discovered her possible cause of action against defendants in 2013 or 2014, or, at the latest, when she was informed by Dr. Frost, following her June 1, 2015 mammogram, that the lump in her breast could be cancerous. We agree.

## A. GOVERNING LAW

The parties acknowledge that plaintiff did not file her claim within the two-year limitation period for medical malpractice actions set forth in MCL 600.5805(6).[9] Accordingly, this appeal turns on whether plaintiff timely initiated her claim within the six-month discovery period set forth in MCL 600.5838a(2) which provides, in pertinent part:

> Except as otherwise provided in this subsection, an action involving a claim based on medical malpractice may be commenced at any time within the applicable period prescribed in [MCL 600.5805] or [MCL 500.5851 to MCL 600.5856], *or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later. . . . The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition, or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim is on the plaintiff.* A medical malpractice action that is not commenced within the time prescribed by this subsection is barred. [Emphasis added.]

The leading case from the Michigan Supreme Court regarding what is also known as the "six-month discovery rule" is *Solowy*. *Solowy*, 454 Mich at 215. In *Solowy*, the Court was asked to determine whether the six-month discovery period began to run when the plaintiff learned of two potential causes for a lesion on her ear, one of which was "potentially actionable" against medical providers, and the other not, or whether the six-month discovery period commenced only when her physician actually confirmed "the potentially actionable diagnosis." *Id*. at 215-216.

However, before delving into the substance of the parties' argument with respect to when plaintiff discovered, or should have discovered, a possible cause of action against defendants, MCL 600.5838a(2); *Solowy*, 454 Mich at 221, 223, it is first necessary to address plaintiff's argument that "[t]he determination of when a plaintiff discovered or should have discovered the alleged malpractice is a question of fact for the jury where the relevant facts are in dispute." As defendants correctly observe in their briefs on appeal, plaintiff did not raise this specific issue before the trial court in her response to Dr. Gulick's motion for summary disposition or during oral argument in the trial court, and she also did not argue it in her delayed application seeking

---

[9] At the time plaintiff filed her complaint, the applicable limitations period was set forth in MCL 600.5805(6). The statute was amended on June 12, 2018, 2018 PA 183 and the applicable limitation period is now set forth in MCL 600.5805(8).

leave to appeal in this Court. Notably, this Court's order granting plaintiff's delayed application for leave to appeal specifically states that this appeal "is limited to the issues raised in the application and supporting brief. MCR 7.205(E)(4)." *Hutchinson v Ingham Co Health Dep't*, unpublished order of the Court of Appeals, entered June 26, 2018 (Docket No. 341249).

In any event, plaintiff's argument is clearly without merit because in *Solowy*, the Michigan Supreme Court, citing its earlier decision in *Moll v Abbott Laboratories*, 444 Mich 1; 506 NW2d 816 (1993), expressly held, that "'in the absence of disputed facts, the question whether a plaintiff's cause of action is barred by the statute of limitations is a question of law to be determined by the trial judge.'" Moreover, contrary to plaintiff's assertions in her brief on appeal, the facts in this case concerning plaintiff's course of treatment for the lump in her breast are not disputed. Rather, what is disputed is *when* plaintiff discovered, or *should have* discovered, her possible cause of action against defendants. For example, the parties do not dispute that plaintiff had a mammogram performed on September 4, 2013, at Sparrow Hospital, and that in a follow up visit to Salisbury, plaintiff was informed that the lump in her left breast was a benign calcification. Moreover, there is no dispute that plaintiff, when she recognized that the lump was growing in the months following her September 4, 2013 mammogram, reported the growth to Salisbury and was assured that the growth was a benign calcification. The parties also do not disagree concerning the course of treatment plaintiff received in Arkansas, although there is some confusion[10] among the parties with regard to the specific dates of plaintiff's treatment. For example, Dr. Gulick contends that plaintiff spoke to the radiologist, Dr. Frost, about a possible breast cancer diagnosis on June 1, 2015. However, a review of plaintiff's deposition testimony reflects that the date that plaintiff spoke with Dr. Frost is unclear and defendants Ingham County Health Department and Salisbury concede this fact. Again, what the parties disagree on is *when*, based on the facts in the record presented to the trial court and this Court, plaintiff discovered, or *should have* discovered her possible cause of action. Because the trial court's ruling in favor of defendants involved a legal determination on the basis of undisputed facts, plaintiff's argument that the question when she discovered or should have discovered her claim should be presented to the jury is unpersuasive. *Solowy*, 454 Mich at 216, 230, 232.

In *Solowy*, the Michigan Supreme Court held that the six-month discovery period for the plaintiff's medical malpractice claim began to run when the plaintiff "learned that one of two possible diagnoses for her lesion [on her ear] was potentially actionable because it was at this point that she should have discovered a possible cause of action." *Id*. at 216. The plaintiff had originally been treated for a cancerous lesion on her left ear in 1986, and she alleged that one of the physicians treating her informed her during her earlier treatment that the cancer was "gone" with no chance of it reoccurring. *Id*. at 216-217. The plaintiff also claimed that she was not informed that she should return to see her physicians for additional follow-up treatment. *Id*. at

---

[10] The confusion among the parties with regard to the date of plaintiff's conversation with Dr. Frost following her mammogram in Arkansas is not material to the disposition of this appeal, given our conclusion, following the analysis of applicable Michigan precedent, that pursuant to the specific circumstances of this case, plaintiff did not, and should not, have discovered her possible cause of action until she received her diagnosis of breast cancer on June 15, 2015.

217. In January 1992, five years after her initial treatment with the defendant physicians, the plaintiff found a similar lesion on her left ear in approximately the same location. *Id*. at 217. Notably, her symptoms were "nearly identical" to what she had experienced five years earlier, and she testified in her deposition that she felt the experience "'started all over again.'" *Id*. When she consulted with a dermatologist on March 27, 1992, the plaintiff was informed that there were two possible diagnoses for the new lesion, one of which was cancerous, and one of which was not. *Id*. Following a biopsy, the plaintiff was informed on April 9, 1992 that the lesion on her ear was once again cancer, and she had to undergo extensive surgery, removing the top portion of her left ear, to remove the cancer. *Id*. The plaintiff filed her medical malpractice lawsuit on October 5, 1992, and the defendant physicians moved for summary disposition, claiming that the plaintiff's action was time-barred by the statute of limitations. *Id*. at 217-218. The trial court agreed with the defendant physicians, this Court affirmed the trial court's ruling, and the plaintiff filed an application for leave to appeal in the Michigan Supreme Court. *Id*. at 218-219.

On appeal in the Michigan Supreme Court, the plaintiff contended that the "possible cause of action" standard that the trial court and the Court of Appeals had relied on, first articulated in *Moll* and *Gebhardt v O'Rourke*, 444 Mich 535; 510 NW2d 900 (1994), should not apply in the context of medical malpractice actions. The Michigan Supreme Court disagreed, and affirmed the use of the "possible cause of action" standard in discerning when the six-month discovery period begins to run. *Id*. at 221, 223. As the *Solowy* Court explained, "[o]nce a plaintiff is aware of an injury and its possible cause, the plaintiff is equipped with the necessary knowledge to preserve and diligently pursue his claim." *Id*. at 223. In applying the "possible cause of action" standard to the plaintiff's medical malpractice claim in *Solowy*, the Court observed that an objective standard must be used when determining when the plaintiff should have discovered her injury, and that a plaintiff "need not be able to prove each element of the cause of action before the statute of limitations begins to run." *Id*. at 223-224. The Michigan Supreme Court ultimately held that the record confirmed that the plaintiff was aware of her possible cause of action on March 27, 1992 when she first consulted with a dermatologist and was informed that her lesion on her left ear could potentially be cancerous. *Id*. at 224. Notably, the *Solowy* Court emphasized that the plaintiff was aware that her symptoms "were identical to those she had experienced five years earlier." *Id*.

Additionally, given that the plaintiff alleged in her complaint that she was not informed by the defendant physicians that her cancer could recur and that she should proceed with follow-up treatment, the *Solowy* Court determined that as of March 27, 1992, the plaintiff knew of her injury, the progression of a potentially cancerous lesion on her ear, and the possible cause, that being the alleged failure of the defendant physicians in 1986 to advise her that her cancer could return and that she needed follow-up treatment. *Id*. Observing that the "possible cause of action" standard did not require that the plaintiff "be aware of the full extent of her injury before the clock begins to run[,]" the *Solowy* Court held that as of March 27, 1992, the plaintiff "was armed with the requisite knowledge to diligently pursue her claim." *Id*. at 224-225.

In *Solowy*, the Court went on to elaborate that a "delay in diagnosis may delay the running of the six-month discovery period in some cases[ ]" because under some circumstances, an illness or a diagnosis may not be possible until a test, or a series of such tests, are performed. *Id*. at 226.

In such a case, it would be unfair to deem the plaintiff aware of a possible cause of action before he could reasonably suspect a causal connection to the negligent act or omission. While according to *Moll*, the "possible cause of action" standard requires less knowledge than a "likely cause of action standard," it still requires that the plaintiff possess at least some minimum level of information that, when viewed in its totality, suggests a nexus between the injury and the negligent act. In other words, the "possible cause of action" standard is not an "anything is possible" standard. [*Id.*]

Thus, the *Solowy* Court cautioned that a flexible approach must be employed in applying the "possible cause of action" standard, and that in invoking such a flexible approach, courts should weigh the following:

In applying this flexible approach, courts should consider the totality of information available to the plaintiff, including his own observations of physical discomfort and appearance, his familiarity with the condition through past experience or otherwise, and his physician's explanations of possible causes or diagnoses of his condition. [*Id.* at 227.]

Again, the *Solowy* Court emphasized that the plaintiff, even before her 1992 cancer diagnosis, was aware that her symptoms were the very same as what she had experienced five years earlier, and that "her observations of the discomfort and of the appearance and condition of her ear should have aroused suspicion in her mind that the lesion might be cancer." *Id.* at 227-228. Under the specific facts of that case, the plaintiff's personal observations of her condition and symptoms, together with her dermatologist explaining that her cancer could have returned, "supplied [the plaintiff] with enough information to satisfy the standard." *Id.* at 228. The *Solowy* Court summarized its reasoning with respect to cases that involve a delayed diagnosis in the following manner:

In summary, we caution that when the cause of a plaintiff's injury is difficult to determine because of a delay in diagnosis, the "possible cause of action" standard should be applied with a substantial degree of flexibility. In such a case, courts should be guided by the doctrine of reasonableness and the standard of due diligence and must consider the totality of information available to the plaintiff concerning the injury and its possible causes. While the standard should be applied with flexibility, it should nevertheless be maintained so that the legitimate legislative purposes behind the rather stringent medical malpractice limitation provisions are honored. [*Id.* at 230.]

More recently, in *Jendrusina v Mishra*, 316 Mich App 621, 624; 892 NW2d 423 (2016), the plaintiff filed a medical malpractice action against his primary care providers, and after the defendants moved for summary disposition, claiming that the plaintiff had not filed his action in a timely manner, the trial court granted the defendants' motion, concluding that the plaintiff had not filed his claim in compliance with the six-month discovery period set forth in MCL 600.5838a(2). The plaintiff was diagnosed with kidney failure in January 2011, and he claimed that he did not become aware of his medical malpractice claim until September 20, 2012, when he consulted with a nephrologist, who informed him that he ought to have been referred earlier to

a nephrologist for treatment. *Jendrusina*, 316 Mich App at 625. The next day the plaintiff contacted his attorney, and this Court, disagreeing with the trial court, found that, after calculating the six-month discovery period from September 20, 2012, the plaintiff had filed his case in a timely manner. *Id.* at 626-627.

Noting the importance of being "strictly guided" by the plain language of MCL 600.5838a(2), this Court observed that the Legislature used the language "should have" rather than "could have" in the text of MCL 600.5838a(2) when referring to the discovery of a plaintiff's claim. *Jendrusina*, 316 Mich App at 626. Referring to the dictionary definitions of "could" and "should" this Court observed that the difference between the two is that the word "could" is employed to reflect a *possibility*, while the word "should" denotes a *probability*. *Id.* at 626. This Court also clarified, in pertinent part:

> Therefore, the inquiry is not whether it was *possible* for a reasonable lay person to have discovered the existence of the claim; rather, the inquiry is whether it was probable that a reasonable lay person would have discovered the existence of the claim. [*Id.*]

In *Jendrusina*, the plaintiff's medical chart that the defendant physician maintained indicated that the plaintiff was experiencing abnormal and worsening levels of two blood measures indicative of poor kidney function. *Id.* at 627. This Court emphasized that the existence of such records were not relevant to the determination of when the plaintiff should have discovered his claim, unless the record reflected that the plaintiff was made aware of the results. *Id.* at 627-628. Contrasting the plaintiff's case with *Solowy*, this Court noted that the plaintiff in *Solowy*, who had been diagnosed with cancer in the past, "knew that her doctor might have committed malpractice as soon as the cancer" returned, but she was waiting to determine whether "she was in fact injured as a result of [her doctor's] actions." *Id.* at 630. Additionally, the *Jendrusina* Court noted that the record did not indicate that the plaintiff in *Jendrusina* should have been aware of a possible cause of action, particularly given that the plaintiff did not have a history of kidney disease, and he was not aware of any blood test results indicating the progression of his condition. *Id.* at 630. Specifically, this Court stated, in pertinent part:

> [A]fter diagnosis in January 2011, plaintiff knew he was sick, but he lacked the relevant data about his worsening lab reports and the medical knowledge to know that his doctor might have committed malpractice. The critical difference between plaintiff in this case and the plaintiff in *Solowy* is that the plaintiff in *Solowy* neither required nor lacked special knowledge about the nature of the disease, its treatment, or its natural history. She knew exactly what her relevant medical history was at all times. She simply delayed pursuing her claim in order to wait for final confirmation of what she already knew was very likely true. Moreover, the *Solowy* plaintiff had visible symptoms that were clearly recognizable as a likely recurrence of her skin cancer long before the ultimate diagnosis. In this case, however, plaintiff's first recognizable symptom, i.e., urine retention, did not occur until January 2011 when it precipitated his hospitalization. [*Id.* at 630-631.]

This Court also offered additional guidance with respect to the Supreme Court's admonition that discerning when a plaintiff knew of their "possible cause of action" is to be done with reference to the "objective facts[.]" *Id*. at 631.

> An objective standard, however, turns on what a reasonable, ordinary person would know, not what a reasonable physician (or medical malpractice attorney) would know. Therefore, the question is whether a reasonable *person*, not a reasonable physician, would or should have understood that the onset of kidney failure meant that the person's general practitioner had likely committed medical malpractice by not diagnosing kidney disease. [*Id*.]

Moreover, simply because the defendant physician in *Jendrusina* had ordered a kidney ultrasound performed after the plaintiff experienced edema and "a slightly elevated lab report in 2008" with the results of the ultrasound being normal, this Court rejected the defendants' suggestion that the plaintiff should have realized that he had kidney disease in 2008. *Id*. at 632-633. Specifically, this Court stated that "[t]he mere *performance* of a noninvasive, commonly administered kidney-imaging study that yielded a normal result" did not amount to an "objective fact" that would lead the plaintiff to conclude that he had a possible cause of action when he was subsequently diagnosed with kidney disease. *Id*. at 633 (citation and quotation marks omitted). While recognizing that it was possible for the plaintiff in *Jendrusina* to have discovered his claim after being diagnosed with kidney failure, the Court noted that to have done so, the plaintiff would have had to independently "undertaken an extensive investigation to discover more information than he had." *Id*. Observing that the plaintiff would have had to study the myriad causes of kidney disease and the way it progressed, as well as independently review his earlier blood test results to determine if they yielded indications of the progression of kidney disease, this Court stated "there is no basis in statute, common law or common sense to impute such a duty to people who become ill." *Id*. at 634.

Perhaps most relevant to the present case is the *Jendrusina* Court's response to the defendants' suggestion that "the diagnosis of any serious illness in and of itself suffices to place on a reasonable person the burden of discovering a potential claim against a primary care physician if at any time in the past the physician *tested* an organ involved in a later diagnosis and reported normal results." *Id*. at 634.

> Certainly any new diagnosis or worsened diagnosis or worsened prognosis is an "objective fact," but it is a substantial leap to conclude that this fact alone should lead any reasonable person to know of a possible cause of action. We agree that anytime someone receives a new diagnosis, worsened diagnosis, or worsened prognosis, that individual could consider whether the disease could or should have been discovered earlier. Moreover, diligent medical research and a review of the doctor's notes might reveal that an earlier diagnosis should have been made. *That, however, is not the standard. We must determine what the plaintiff "should have discovered" on the basis of what he knew or was told, not on the basis of what his doctors knew or what can be found in specialized medical literature.* [*Id*. (emphasis added).]

Accordingly, under such circumstances, the *Jendrusina* Court concluded that the plaintiff's elevated levels of creatinine in his blood tests in prior years "[was] of no moment" particularly given that the plaintiff was not aware of the blood test results, and the record did not suggest he understood what creatinine levels were, or the causes, treatment and progression of kidney disease. *Id*. at 634-635. Put simply, this Court clearly rejected the defendants' intimation that a diagnosis of an illness places the onus on a reasonable person to discover a potential claim of medical malpractice against a medical provider if, in the past, the medical provider tested the organ involved in the diagnosis and the earlier test yielded normal results. *Id*. at 635.

> To hold as defendants suggest would not merely be inconsistent with the text of the statute, but it would also be highly disruptive to the doctor-patient relationship for courts to advise patients that they "should" consider every new diagnosis as evidence of possible malpractice until proven otherwise. Had the Legislature intended such a result, it would have used the phrase "could have discovered," not "should have discovered." [*Id*.]

## B. APPLICATION

On appeal, plaintiff claims that the six-month discovery period started to run when she first became aware that she was diagnosed with breast cancer. According to plaintiff, while she was certainly aware of the lump in her breast throughout 2013 and 2014, she had no reason to know of a possible cause of action until she received her biopsy results demonstrating that the lump was malignant. In plaintiff's view, until she received her biopsy results, she had every right to trust that defendants had provided her with a correct diagnosis concerning the lump in her breast. Plaintiff also asserts that she cannot be held to the standard of a medical professional and a reasonable, ordinary person would not have been aware of a possible cause of action under the circumstances of this case until plaintiff was made aware of her biopsy results.

Conversely, defendants argue that the six-month discovery period started to run in 2013 and 2014, or at the latest, when plaintiff was informed by Dr. Frost that she would need a biopsy following her June 1, 2015 mammogram in Arkansas. In support of their argument that the six-month discovery period started to run in late 2013 or 2014, defendants repeatedly point to the fact that plaintiff testified during her deposition that following her September 4, 2013 mammogram, she continued to examine her left breast and noted that the lump in her breast was continuing to grow. Defendants also state that because plaintiff testified that she was subjectively concerned that the lump could possibly be cancer, the trial court correctly determined that plaintiff should have discovered her possible cause of action in 2013 and 2014. In making this argument, defendants point to the statutory language of MCL 600.5838a(2), observing that because plaintiff was noting the appearance of the lump in her breast, she should have discovered her possible cause of action at that time. Defendants also compare plaintiff to the plaintiff in *Solowy*, arguing that because plaintiff was aware of the changing size of the lump in her breast and had suspicions that it could be cancer, she was aware of her injury and its possible cause. Moreover, defendants contend that at the very latest, the six-month discovery

period began to run when plaintiff was informed by Dr. Frost that a biopsy was necessary to determine whether the lump in her breast was cancerous.[11]

During her deposition, plaintiff testified that during the time period that ended in June 2014 in which she was being treated by Salisbury following her September 4, 2013 mammogram, she repeatedly raised with Salisbury the fact that the lump was growing, Salisbury acknowledged the growth of the lump, but did not take any further action, and continued to inform plaintiff that the lump was a calcification. According to plaintiff, she "took [Salisbury's] word for it." By her own admission, plaintiff did not undertake any additional independent research or speak to another doctor about the lump in her breast. While plaintiff, in response to pointed questioning by defense counsel during her deposition, voiced her subjective concerns that the lump could have been something more serious, such as cancer, in *Solowy* the Court, citing *Moll*, stated that "the discovery rule period begins to run when, *on the basis of objective facts*, the plaintiff should have known of a possible cause of action." *Solowy*, 454 Mich at 222, 232 (emphasis added). The *Solowy* Court further recognized that "[*o*]*nce a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action.*" *Id*. quoting *Moll*, 444 Mich at 24 (emphasis in original). While the record reflects that in 2013 and 2014 plaintiff was aware that she had a calcified lump in her breast, aside from her subjective concerns as a layperson, the record does not yield objective facts that would have led plaintiff to conclude that the lump was in fact cancer. This is particularly so given that the record demonstrates that her medical provider, Salisbury, continued to tell plaintiff that the calcified lump was benign, and plaintiff, not a medical professional, reasonably relied on the repeated assurances of her medical professional. The factual scenario in this case is therefore decidedly different from that in *Solowy*, as the plaintiff in that case had already undergone a bout of cancer in her ear, she was well-familiar with the symptoms, and by her own admission in her deposition testimony, the symptoms she was experiencing in March and April of 1992 were so similar that she stated "it started all over again." *Solowy*, 454 Mich at 216-217, 227-228.

Further, in *Solowy* the Michigan Supreme Court took care to caution lower courts regarding cases that may involve a delay in diagnosis and delay the running of the six-month discovery period. *Solowy*, 454 Mich at 226. In particular, the *Solowy* Court expressed its concern that it would be unfair to "deem [a] plaintiff aware of a possible cause of action before he could reasonably suspect a causal connection to the negligent act or omission." *Id*. Put simply, the "possible cause of action" standard nonetheless requires that a plaintiff possess at least "some minimum level of information, that, when viewed in its totality, suggests a nexus between the injury and the negligent act." *Id*. In an unequivocal manner, the *Solowy* Court renounced any suggestion that the "possible cause of action" standard may be considered an "anything is possible standard." *Id*. Therefore, while employing the "flexible approach" that the *Solowy* Court articulated, and considering the totality of information available to plaintiff in 2013 and 2014, while plaintiff was no doubt aware that the lump in her breast was growing, she did not have any familiarity with breast cancer "through past experience or otherwise," and according to plaintiff's deposition testimony, Salisbury repeatedly assured her that the lump,

---

[11] As noted, the specific date of this conversation is unclear from the record.

even while growing, was a calcified mass which was demonstrated through the September 4, 2013 mammogram. *Id*. at 227. Under such circumstances, we disagree with the trial court's conclusion that plaintiff, who exercised due diligence by consulting with medical professionals and trusted and relied on the advice given and the observations made by Salisbury, should have discovered her possible cause of action in 2013 or 2014. *Id*. at 230, 232.

We reach this conclusion because the record confirms that plaintiff had sought medical treatment and relied on what she was told, that the lump in her breast was benign, and plaintiff would not know otherwise until a biopsy established that the lump was malignant. Therefore "it would be unfair to deem . . . plaintiff aware of a possible cause of action before [she] could reasonably suspect a causal connection to [an] alleged negligent act or omission." *Id*. at 226. Plaintiff had no reason to suspect that her medical providers were negligent, given that she reasonably relied on what she was told, that her lump was a benign calcification. While plaintiff undoubtedly was aware of the growth of the lump, and admitted that it was causing her subjective fear and concern, she notably did not have a history of breast cancer either herself or in her family and she was justifiably relying on her medical provider's explanation of the cause of the lump. *Id*. at 227; MCL 600.5838a(2).

Importantly, this Court in *Jendrusina* has emphasized that the objective standard requires an evaluation of what "a reasonable, ordinary person would know" about their injury and its cause, not what a reasonable physician or medical malpractice attorney would know. *Jendrusina*, 316 Mich App at 631-632. This Court has also announced that requiring an individual to undertake "an extensive investigation[,]" such as performing independent research or seeking out medical records, to glean more information than he or she has been given by their medical professional, is a requirement that is not consistent with Michigan common law, statutory authority or "common sense." *Id*. at 633-634. Therefore, applying the doctrine of reasonableness, weighing plaintiff's conduct against the standard of due diligence, and considering all of the information that plaintiff had in 2013 and 2014 regarding her injury and its possible causes, the record does not support a conclusion that plaintiff should have discovered her possible cause of action in 2013 or 2014. *Solowy*, 454 Mich at 230.

Similarly, although the record reflects that plaintiff was informed by Dr. Frost at some point following her June 1, 2015 mammogram that a biopsy was necessary because of a general concern that the lump in her breast could be cancer, the situation that plaintiff was presented with is also factually distinguishable from *Solowy*. Notably, unlike the plaintiff in *Solowy*, plaintiff had not had a prior cancer diagnosis, and she had not experienced similar symptoms in her breast in the past. *Solowy*, 454 Mich at 224. Moreover, unlike the plaintiff in *Solowy*, plaintiff was not informed that she could be faced with a recurrence of cancer, and aside from her dealings with Salisbury in 2013 and 2014 in which she was assured that the lump in her breast was benign, plaintiff had not had prior interactions with a medical professional concerning the possibility of cancer. *Id*. In contrast to the plaintiff in *Solowy*, plaintiff was not waiting to pursue her claim "to wait for final confirmation of what she already knew was very likely true." *Jendrusina*, 316 Mich App at 631. Therefore, on the basis of the record, it is not reasonable to conclude that plaintiff should have discovered her possible cause of action when she was informed of the necessity of a biopsy. Moreover, the *Jendrusina* Court made it abundantly clear that the diagnosis of a serious illness will not place a burden on a reasonable person to discover a potential claim against his or her medical providers, "if at any time in the past the physician

tested an organ involved in [the] later diagnosis and reported normal results." *Id*. at 634. To hold otherwise is not only incongruent with the plain language of MCL 600.5838a(2), but it would be "highly disruptive to the doctor-patient relationship." *Jendrusina*, 316 Mich App at 635. Accordingly, we disagree with the trial court's legal conclusion that plaintiff was aware of an injury in the form of breast cancer, and any possible causation relating to the alleged medical malpractice of defendants, before her definitive diagnosis of breast cancer. *Soloway*, 454 Mich at 222, 224. Considering the information that was available to plaintiff at the time of her conversation with Dr. Frost, plaintiff did not know whether the lump was cancerous or not, and unlike the plaintiff in *Solowy*, she had not undergone a prior experience with cancer that would have informed her experience or made her familiar with a cancer diagnosis. *Id*. at 227. It was not until June 15, 2015, when plaintiff received a definitive diagnosis of cancer, that plaintiff discovered or should have discovered her possible cause of action, in that she became aware that she had breast cancer, and could have surmised that defendants were negligent in the treatment of the lump in her breast when she consulted with medical professionals at the Ingham County Health Department. Given that her notice of intent was mailed on December 4, 2015, her cause of action was timely filed.

## IV. CONCLUSION

We reverse the trial court's order granting summary disposition in favor of defendants and remand for proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff, as the prevailing party, may tax costs pursuant to MCR 7.219.

/s/ Karen M. Fort Hood
/s/ Mark T. Boonstra
/s/ Patrick M. Meter