*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DELANEY LONSWAY, CAMERYN LONSWAY, MICHAEL LONSWAY, and SUSAN LONSWAY,

Plaintiffs-Appellants,

v

YALE UNIVERSITY, YALE UNIVERSITY SCHOOL OF MEDICINE, ALLEN E. BALE, M.D., JESSICA N. EVERETT, and ELENA MARTINEZ STOFFEL, M.D.,

Defendants-Appellees.

UNPUBLISHED
February 11, 2021

No. 350759
Washtenaw Circuit Court
LC No. 18-000857-NH

DELANEY LONSWAY, CAMERYN LONSWAY, SUSAN LONSWAY, and MICHAEL LONSWAY,

Plaintiffs-Appellants,

v

UNIVERSITY OF MICHIGAN REGENTS, UNIVERSITY OF MICHIGAN, and UNIVERSITY OF MICHIGAN HEALTH SYSTEM,

Defendants-Appellees.

No. 350775
Court of Claims
LC No. 18-000153-MH

Before: CAVANAGH, P.J., and SERVITTO and CAMERON, JJ.

PER CURIAM.

-1-

In these consolidated medical malpractice actions[1] arising from genetic testing results that were erroneously reported in 1999, plaintiffs Delaney, Cameryn, Susan, and Michael Lonsway appeal as of right an order granting summary disposition in favor of defendants, Yale University (Yale), Yale University School of Medicine, Allen E. Bale, M.D., Jessica N. Everett, Elena Martinez Stoffel, M.D., University of Michigan Regents, University of Michigan (UM), and University of Michigan Health System,[2] on the ground that plaintiffs' claims are time-barred. We reverse and remand for further proceedings.

## I. BACKGROUND FACTS

The underlying facts in this case are mostly undisputed. Plaintiffs have an extensive family history of melanoma (a form of skin cancer), and Michael was first diagnosed with melanoma in 1997, when he was 32 or 33 years old. In 1999, Michael and his wife, Susan, consulted with Stephen Gruber, M.D., who was then the director of UM's cancer genetics clinic. Because Michael carried a hereditary p16 gene mutation[3] associated with melanoma, Michael and Susan agreed to genetic testing for their daughters, Delaney and Cameryn, then five years old and three years old, respectively. According to Susan, Dr. Gruber advised them that if either child had the p16 gene mutation, the family could implement preventative measures to mitigate the risk of developing melanoma. UM obtained blood samples from both girls and sent the samples to Yale's DNA Diagnostics Laboratory for analysis. The Yale laboratory concluded that Cameryn had the p16 gene mutation, but Delaney did not.

Dr. Gruber conveyed the results to plaintiffs, indicating that Cameryn's risk of developing melanoma was substantially increased because of her p16 gene mutation. He explained that the average risk of developing melanoma for a Caucasian female in the general population was about 1.8%, but the risk increased to a range of 60% to 80% for individuals with a p16 gene mutation. Thereafter, Susan and Michael implemented stringent protective measures for Cameryn. Although Delaney was also expected to follow similar rules, they were not as vigorously enforced for her.

During routine internal auditing in July 2014, the Yale laboratory discovered that the originally reported results were inaccurate. According to Dr. Bale, the scientific director of Yale's laboratory, the samples were not mistakenly switched; rather, the mix-up occurred during an intermediate step between DNA extraction and reporting the results. On July 29, 2014, the same

---

[1] Plaintiffs filed lawsuits in Washtenaw Circuit Court and the Court of Claims. The Court of Claims action was transferred to Washtenaw Circuit Court and consolidated with the circuit court case before entry of the order appealed. These actions were also consolidated on appeal. *Lonsway v Yale Univ*, unpublished order of the Court of Appeals, entered October 9, 2019 (Docket Nos. 350759 and 350775).

[2] Yale University, Yale University School of Medicine, and Dr. Bale will be collectively referred to as Yale defendants. UM, University of Michigan Regents, University of Michigan Health System, Everett, and Dr. Stoffel will be collectively referred to as UM defendants.

[3] The p16 gene mutation is also known as "CDKN2A." The gene mutation also creates an increased risk of pancreatic cancer.

-2-

day he learned of the error, Dr. Bale notified UM by way of a letter addressed and faxed to Dr. Stoffel. The letter said:

> I am writing regarding genetic testing done by my lab in 1999 that was ordered by Dr. Stephen Gruber. When I looked up his contact information, I got your name as the new director of the Cancer Genetics Program at the University of Michigan.[4]

> The reason for this communication is that in the process of a routine quality control audit of our melanoma testing, we came across a possible misinterpretation of data. The samples we are concerned about came from patients Delaney Lonsway (DOB 10/5/93) and Cameryn Lonsway (DOB 11/6/95). Direct sequencing had shown a possible deleterious CDKN2A missense alteration in an affected relative of these patients . . . . In 1999, we tested these two individuals using a restriction enzyme-based assay, exploiting a Ddel site that was affected by the missense change. I am concerned that the report we issued was incorrect because recent analysis of the old samples by direct sequencing did not agree with our original result.

> From a laboratory point of view, the correct steps going forward would be to obtain new samples and re-test using the most up-to-date technology. I am writing to you in hopes that you have some means of re-contacting this family. We would, of course, cover all costs of re-testing whether done at Yale or by another facility.

On August 22, 2014, Everett, a certified genetics counselor with the UM cancer genetics clinic, responded to Dr. Bale's letter by e-mail. Dr. Stoffel was copied on the e-mail. Everett indicated that she worked with plaintiffs in the past and asked, "Before we re-contact the family, can you give us some additional information about what you think the problem may be?" Everett noted that "[t]his is a pretty savvy family, and they will have a million questions." Dr. Bale called Everett the next business day. Dr. Bale testified that Everett asked why Yale could not simply issue a corrected report without retesting. He explained that it would be best to retest Delaney and Cameryn because the quality of the DNA in their 15-year-old samples had degraded. The conversation was not long, but Dr. Bale was confident that Everett understood the significance of the information and his belief that the girls should be retested. Dr. Bale expected that UM would get new samples for testing, which would necessarily involve contacting plaintiffs about the error. At that point, Dr. Bale felt that he satisfied his duty concerning the error.[5] It is undisputed that Everett did not notify plaintiffs about Yale's discovery.

---

[4] Dr. Stoffel replaced Dr. Gruber as director of the cancer genetics clinic in 2011.

[5] Although Dr. Bale had plaintiffs' 1999 contact information, he did not think it was appropriate to contact them directly because he did not have a physician-patient relationship with them.

In early 2016, Delaney noticed two new moles—one on her lower back and one on her right thigh. Delaney reported the moles to her dermatologist, Dr. Omar Salem, during her annual examination in March 2016. Because Delaney did not have the p16 gene mutation, neither she nor Dr. Salem was particularly concerned. Consequently, the moles were not removed or biopsied until May 2016, and the result of the biopsy—which was positive for melanoma—was not communicated to Delaney until November 30, 2016.[6]

Susan called Everett on November 30, 2016, to let her know about Delaney's diagnosis. Susan testified that Everett assured her UM "did not mix up the samples on their end," and explained the labeling process UM used for blood samples. Everett did not remember this conversation at the time of her deposition, but she had no reason to dispute it. Susan also sent Everett an e-mail on December 2, 2016, indicating that plaintiffs were seeking a second opinion and treatment recommendation from the University of Pittsburgh Medical Center (UPMC). Susan observed that Delaney was the youngest person in the family to develop melanoma, despite testing negative for the p16 gene mutation. Susan asked about the statistical rate for false negatives on genetics tests and noted that "[s]omething just doesn't add up here!" Lastly, Susan advised Everett that they planned to repeat the genetic tests for both girls at UPMC and would let her know the results. Susan testified that she sent the e-mail to Everett just to keep her in the loop; Everett had always been helpful and Susan wanted to know if Everett had any ideas or advice about the matter. Everett responded by e-mail the same day, saying:

> Thanks for the information. I know the consensus is that melanoma risk is still elevated in patients who are negative for family CDKN2A mutation, but I haven't been able to find firm numbers. Same deal for having a patient with melanoma – risk increased, but hard to pin down. I think it's complicated by all the other risk factors that can muddy things – sun exposure, having moles, red hair gene, etc. This is why skin checks are recommended for everyone in CDKN2A families (and anyone with a close relative with melanoma) . . . .
>
> It makes sense to retest the girls – lab errors and tech errors are rare, but we've seen them happen.

Susan testified that she left a phone message for Everett in late December 2016 or early January 2017 because Everett's e-mail response did not answer Susan's questions. Susan was confused "about why . . . Delaney had cancer, about what, what happened." Everett did not return Susan's phone call. Everett testified that she did not remember receiving a message from Susan.

Plaintiffs met with a doctor at UPMC on December 12, 2016. The doctor recommended having Delaney retested for the p16 gene mutation in light of her cancer diagnosis after previously testing negative. A blood sample was collected the same day. Plaintiffs learned that Delaney tested positive for the p16 gene mutation when she returned for surgery on January 3, 2017. Cameryn was tested again shortly thereafter. On January 6, 2017, Susan wrote an e-mail to Kelli Leja at UPMC, explaining that Cameryn's blood had been drawn for retesting. In the e-mail, Susan said, "I am glad that is done and I do not have to take her to UM, who made the original mistake

---

[6] A third melanoma was diagnosed in April or May 2017.

in the first place." Around the third week of January, plaintiffs learned that the new genetic testing indicated that Cameryn did not have the p16 gene mutation. Susan testified that she and Michael were shocked to learn they had been protecting the wrong daughter all along. She assumed there was something wrong with the 1999 tests and accepted the new tests as accurate because the new tests made sense in that Delaney had the p16 gene mutation and had cancer, while Cameryn did not have the mutation and did not have cancer.

Susan spoke with Dr. Stoffel for the first time on February 10, 2017. Dr. Stoffel testified that she called Susan after Everett advised her Susan wanted to discuss what happened. Susan testified that she reached out to Dr. Stoffel for a new dermatology referral and to discuss the conflicting results of the girls' genetic tests. Susan was not comfortable communicating with Everett at that point because of Everett's recent nonresponsive behavior. According to Dr. Stoffel's records, Susan reported Delaney's melanoma diagnosis and the fact that results of recent genetics tests were at odds with what plaintiffs were originally told in 1999. Dr. Stoffel's records also state:

> Ms. Lonsway wanted to know how her daughters' specimens or test results could have been switched.
>
> I told her that since the genetic testing was performed in 1999 at an external laboratory it is difficult to determine with certainty what happened. I reassured her that [UM] follows CLIA best practice guidelines for clinical tests. At her request I put her in touch with the UM Office of Patient Safety.

Dr. Stoffel testified that she also suggested Susan contact Yale about what may have gone wrong in the laboratory. Susan agreed that Dr. Stoffel referred her to the UM Office of Patient Safety, but indicated that the referral was about Everett's recent behavior—not concerns regarding the erroneous test results. On March 3, 2017, Dr. Stoffel called Susan again to provide the dermatology referral Susan requested during their last conversation.

On August 16, 2017, Susan called Dr. Bale. Susan testified that before she finished explaining what had happened, Dr. Bale stopped her to say he was familiar with the case, as the laboratory had discovered the error through random testing in 2014 and notified UM. Dr. Bale was surprised to learn that UM never reported the error to plaintiffs and agreed to give Susan any information she wanted. Shortly after concluding their conversation, Dr. Bale sent an e-mail to Susan promising to produce the letter he sent to UM after it was retrieved from archived storage. He also produced Everett's August 22, 2014 e-mail asking for additional information before she contacted plaintiffs.

During this litigation, Everett signed an admission of liability, acknowledging that she received Dr. Bale's letter in 2014. She "did not understand the precise nature of Dr. Bale's concerns or the reasoning behind his request for new samples and re-testing," so she intended to seek clarification from Dr. Bale before contacting plaintiffs. With respect to her August 25, 2014 phone call with Dr. Bale, Everett said, "I do not recall the exact nature of this telephone call, but in a general sense, I understood that Dr. Bale's concern was that the original testing reports by Yale on Cameryn Lonsway and Delany Lonsway were incorrect." Everett explained that she intended to contact plaintiffs after speaking with Dr. Bale, but did not do so. She did not remember

why she failed to convey the information to plaintiffs, and acknowledged that her mistake breached the standard of care. Everett did not believe that Dr. Stoffel was aware of Dr. Bale's letter, and Everett did not discuss the letter with Dr. Stoffel.

Everett testified that she first met plaintiffs in 2008 when they came in for a review and updated recommendations from Dr. Gruber. In the following years, Susan would e-mail Everett occasionally with questions or updates about the family. Everett thought they had a good relationship; plaintiffs trusted her and she felt like she failed them. Everett could not remember how she received Dr. Bale's letter. She anticipated that plaintiffs would have questions about how the error was discovered after 15 years, as plaintiffs were the type of family who wanted detailed information. They were always interested in primary research and understanding the p16 gene. Everett copied Dr. Stoffel on her e-mail to Dr. Bale to keep her in the loop for when they discussed the matter latter. Everett opined that she forgot to communicate with plaintiffs because she misplaced the paper on which she documented the matter, and it was essentially an "out of sight, out of mind" situation. She simply forgot about the situation after she spoke with Dr. Bale. Everett denied that she was hesitant to contact plaintiffs because of their anticipated reaction and explained that sharing unpleasant information was a routine part of her job. Everett's memory of the 2014 events was not triggered when she spoke with Susan in November 2016, but she recalled feeling unsettled in the days after their conversation. She wondered if she missed something, but there were no records for her to find. She did not remember the details of what happened until she received plaintiffs' NOI.

Dr. Stoffel testified that the first time she saw Dr. Bale's letter was in the course of this litigation; she did not receive the letter when it was faxed in 2014. Dr. Stoffel understood that she was copied on Everett's e-mail to Dr. Bale in 2014, but she did not remember receiving it. Everett did not follow up with her after speaking with Dr. Bale in 2014.

On or about December 29, 2017, plaintiffs served the UM defendants with a NOI to file a claim concerning the foregoing events. Plaintiffs also filed a notice with the Court of Claims on January 2, 2018. An additional NOI was served on the Yale defendants on or about February 9, 2018.

Plaintiffs initiated two medical malpractice lawsuits in August 2018. The first was filed on August 13, 2018, in Washtenaw Circuit Court against the Yale defendants, Dr. Stoffel, and Everett. In Count I, Delaney alleged that the Yale defendants breached the applicable standard of care by mixing up her blood sample, not discovering the error for nearly 15 years, and not informing Delaney or her parents when they discovered the error in 2014. In Count II, Delaney alleged that Dr. Stoffel and Everett breached the applicable standard of care by failing to inform Delaney and her parents of the error when it was discovered in 2014 or anytime thereafter, which Delaney characterized as "deliberate and intentional" failures. Counts III and IV involved the same alleged breaches with respect to Cameryn. Counts V through VIII also involved the same alleged breaches of duties owed to Susan and Michael, premised on the notion that defendants owed these duties to Susan and Michael because they were responsible for Delaney's and Cameryn's care during the girls' minority.

Plaintiffs' second medical malpractice complaint was filed in the Court of Claims on August 28, 2018. The second complaint named UM, UM Regents, and UM Health System as

defendants and similarly alleged that UM breached the applicable standard of care because its agent (the Yale lab) mixed up the blood samples from Delaney and Cameryn and failed to discover the error for 15 years, and then UM failed to immediately inform plaintiffs of the error when it was discovered in 2014.[7] Again, plaintiffs alleged that UM's failure to inform them of the error in 2014 was deliberate and intentional. The four-count complaint repeated these allegations with respect to each plaintiff.

UM filed a motion for summary disposition in the Court of Claims in lieu of an answer to the complaint, arguing that plaintiffs' claims were barred for failure to comply with MCL 600.6431(3),[8] which requires filing a notice with the Court of Claims within six months of the event giving rise to the cause of action as a condition precedent to bringing a claim against a governmental agency. UM alleged that plaintiffs' claims arose on July 29, 2014, when Dr. Bale notified UM of the laboratory error. Plaintiffs did not file a notice with the Court of Claims until January 2, 2018, well beyond the six-month time period set forth in MCL 600.6431(3). The Court of Claims denied summary disposition, agreeing with plaintiffs' argument that "the fraudulent-concealment exception in MCL 600.5855, applies to save their claims."[9] The Court of Claims lawsuit was subsequently transferred to Washtenaw Circuit Court and consolidated with plaintiffs' first action.

On May 3, 2019, the Yale defendants moved for summary disposition, arguing that plaintiffs' claims against them were barred by the statute of limitations. The Yale defendants asserted that any claims accruing at the time of the 1999 testing were untimely because they expired after two years pursuant to MCL 600.5805(8) or when the girls turned 10 years old in 2003 (Delaney) and 2005 (Cameryn) pursuant to MCL 600.5851(7). The Yale defendants further argued that plaintiffs' claims were untimely under the six-month discovery rule set forth in MCL 600.5838a(2) because plaintiffs were aware of facts that would objectively cause a person to

---

[7] The focus of plaintiffs' claim is on defendants' failure to notify them of the error in 2014.

[8] MCL 600.6431 was amended by 2020 PA 42 on March 3, 2020, effective retroactively to March 29, 2017. The relevant notice provision is now located in Subsection (4).

[9] More specifically, the Court of Claims held:

> [P]laintiffs' complaint sufficiently alleges a fiduciary relationship pursuant to which [UM] or their agents had an affirmative duty to disclose the testing result mix-up. However, despite the existence of this affirmative duty, defendants remained silent. On the facts alleged, the failure to disclose was intentional, and it prevented plaintiffs from realizing the existence of a potential cause of action against defendants. Defendants stayed silent, despite Dr. Bale's requests and despite plaintiffs' contacts with Dr. Stoffel and with Everett. Allegations of a failure to disclose information pertinent to Delaney's health and treatment is enough to invoke the fraudulent-concealment exception. Moreover—although the allegations suffice to make the more difficulty showing of fraudulent concealment by silence—plaintiffs have alleged affirmative acts designed to prevent discovery of the claims . . . . [Citations omitted.]

discover a possible claim related to the 1999 testing error by February 2017 and plaintiffs expressed a subjective belief concerning the 1999 error no later than May 2017.[10] Moreover, even if plaintiffs could not have discovered a possible cause of action until August 2017 when Dr. Bale confirmed Susan's suspicions, their claims would be barred by the six-year statute of repose in MCL 600.5838a(2). The Yale defendants opined that plaintiffs would rely on a continuing wrong theory, but argued that plaintiffs could not extend the limitations period without identifying a "specific act or omission occurring on a particular date." Thus, to the extent plaintiffs took issue with Dr. Bale's decision to notify UM of the error rather than plaintiffs, the claim accrued in July or August 2014 and was time-barred by August 2016, well before plaintiffs served their NOI in February 2018.

Plaintiffs opposed the Yale defendants' motion because plaintiffs' claims did not accrue until August 16, 2017, when they discovered that defendants collectively failed to inform them of the laboratory error. If plaintiffs' claims accrued before August 16, 2017, the limitations period was tolled under the discovery rule in MCL 600.5838a(2) or the fraudulent-concealment exception in MCL 600.5855. Additionally, plaintiffs argued that they did not have to demonstrate affirmative acts and misrepresentations to establish fraudulent concealment because plaintiffs' physician-patient relationship with Dr. Stoffel and Everett was a fiduciary relationship, which gives rise to an affirmative duty of disclosure. Plaintiffs also disagreed with the Yale defendants' reliance on the six-year statute of repose because the UM defendants, acting as the Yale defendants' agents, fraudulently concealed plaintiffs' claims.

On May 15, 2019, the UM defendants also moved for summary disposition on the basis of the statute of limitations and plaintiffs' failure to comply with the six-month notice requirement in MCL 600.6431. The UM defendants asserted that because plaintiffs' claims arose from the UM defendants' failure to immediately notify them about the laboratory error, the claim accrued on July 29, 2014, or in August 2014 at the latest, such that the two-year limitations period for medical malpractice expired by August 2016. Plaintiffs' December 29, 2017 NOI was therefore untimely. Like the Yale defendants, the UM defendants also argued that plaintiffs could not rely on the six-month discovery period set forth in MCL 600.5838a(2) because plaintiffs knew or should have known of a possible claim by November or December 2016, or by May 2017 at the absolute latest. For the same reasons, UM argued that plaintiffs' claims were barred for failure to comply with the statutory requirement that notice be filed with the Court of Claims within six months of the event giving rise to the cause of action. The UM defendants acknowledged the Court of Claims' earlier

---

[10] On or about May 5, 2017, Susan and Michael sent a letter to Dr. Salem to express their concerns about his care with respect to Delaney. In pertinent part, the letter said:

> It is surprising that over the years of monitoring Delaney and her sister (since 2010), there was never a question about the genetic test results despite the file notes describing Delaney's moles as atypical and [Cameryn's] moles as sparse and typical. As it turns out, the genetic test results were switched in the lab due to human error and Delaney carries the P16 gene, not [Cameryn], as previously reported.

denial of summary disposition for failure to comply with MCL 600.6431(3), but reasoned that discovery revealed there was no fraudulent concealment.

Plaintiffs filed a response to the UM defendants' motion on May 29, 2019. Again, plaintiffs maintained that their claims did not accrue until August 16, 2017, when Dr. Bale admitted that he previously discovered the laboratory error and reported it to UM or, alternatively, that the limitations period was tolled under the discovery rule or fraudulent-concealment exception. Plaintiffs argued that they did not know of their claims sooner because the UM defendants intentionally failed to disclose known, pertinent information in violation of the UM defendants' affirmative duty of disclosure. Plaintiffs also asserted that their statutory notice in the Court of Claims was timely because the six-month notice requirement in MCL 600.6431(3) was extended to two years by the UM defendants' fraudulent concealment.

On September 5, 2019, the trial court entered an order granting defendants' dispositive motions. In pertinent part, the trial court opined that the six-year statute of repose barred any claims stemming from the 1999 testing error, and plaintiffs' allegation regarding defendants' failure to inform them of the error in 2014 "is part of [plaintiffs'] general claim of malpractice and is not a claim of fraudulent concealment." The court further explained:

> Under Plaintiffs' theory, although they clearly suspected a testing error, they never suspected that Defendants had discovered the testing error and never told them about it. However, the Court finds, as a matter of law, that Plaintiffs have failed to meet their burden of proof that they should not have discovered their claims earlier. Instead, the undisputed evidence shows that while Defendants' failure to inform Plaintiffs about the testing error may have delayed discovery, it did not prevent Plaintiffs from diligently pursuing and discovering their potential malpractice claims.

> As Defendants argue, Plaintiffs were "equipped with the necessary knowledge to preserve and diligently pursue" their claims once they were aware of the testing discrepancy and, as they were told by Defendant Everett on November 30, 2016, that Regents "did not mix up the test samples" and that "lab errors were rare but that they happen." . . .

> The Court finds that Plaintiffs were not prevented from discovering their claims and should have discovered their claims, at the latest, by February 2017, when the retesting results were opposite those reported in 1999. At that time, Plaintiffs knew of the significant or 50-50 chance that a testing error had occurred and that Defendants may have failed to inform them. More importantly, it is readily apparent from the record that, with minimal diligence, Plaintiffs' discovery of their actual malpractice claims was only ever a phone or email message away, as aptly demonstrated by their contact with Yale on August 16, 2017.

> Viewing the evidence in the light most favorable to Plaintiffs, and with due consideration of the significance that a "delayed diagnosis" presents, the Court finds that the applicable statutes of limitations bar Plaintiffs' action. The Court finds, as argued by Defendants, the "six year cap" clearly bars Plaintiffs' claims against Defendants related to the 1999 error. MCL 600.5838a(2). The malpractice

claims based on the failure to disclose in 2014 are barred under the applicable two-year statute of limitations, MCL 600.5805(8) and are not saved by tolling or the discovery rule. Because Plaintiffs' action was not commenced until August 3, 2018, it is untimely and summary disposition is properly granted.

This appeal followed.

## II. UM DEFENDANTS

Plaintiffs argue that their medical malpractice claims, as set forth in their notice of intent and affidavits of merit, are premised on the fact that the UM defendants failed to inform plaintiffs of the genetic testing error when it was discovered in July 2014. Further, there was no way that plaintiffs could have discovered that the UM defendants breached their duty to inform them of that testing error before August 16, 2017, when Susan spoke to Dr. Bale and he told her that the testing error had been discovered in 2014 and that the UM defendants were told about the testing error at that time. Thus, plaintiffs argue, their claims accrued for purposes of the statute of limitations on August 16, 2017, and are not time-barred. Accordingly, the UM defendants were not entitled to summary disposition under MCR 2.116(C)(7). We agree.

## A. STANDARD OF REVIEW

A trial court's summary disposition ruling is reviewed de novo on appeal. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "Summary disposition under MCR 2.116(C)(7) is appropriate if a claim is barred because of the statute of limitations." *Sabbagh v Hamilton Psychological Servs, PLC*, 329 Mich App 324, 335; 941 NW2d 685 (2019). The reviewing court must consider all documentary evidence submitted by the parties and accept all well-pleaded allegations as true, viewing both the pleadings and supporting evidence in the light most favorable to the nonmoving party. *Id*. at 335-336; *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013). "If there is no factual dispute, whether a plaintiff's claim is barred under the applicable statute of limitations is a matter of law for the court to determine." *Kincaid*, 300 Mich App at 523.

## B. STATUTE OF LIMITATIONS

Under MCL 600.5805(8), the statute of limitations for a cause of action alleging medical malpractice is two years. And a claim "accrues at the time of the act or omission that is the basis for the claim of medical malpractice, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim." MCL 600.5838a(1). Thus, we turn to the allegations set forth in plaintiffs' complaint to determine when each alleged act or omission occurred. See *McKiney v Clayman*, 237 Mich App 198, 202; 602 NW2d 612 (1999). The primary allegation against the UM defendants is that they failed to inform plaintiffs of the testing error when UM was notified of the error on July 29, 2014. Plaintiffs' claims against the UM defendants were not premised on the actual testing error; rather, their claims were premised on the failure of UM *to inform* them of that error once it was discovered. In fact, it was undisputed that the Yale defendants were responsible for the actual testing error—not the UM defendants. The UM defendants did not even know about the testing error until July 2014. It was also undisputed that the Yale defendants recommended retesting at that time—in July 2014. Thus, once the UM defendants were notified about the testing

-10-

error, they had a duty to inform plaintiffs of that information. And it was undisputed that the UM defendants did not inform plaintiffs of the testing error or the recommendation for retesting—ever. Accordingly, for purposes of the statute of limitations, plaintiffs' claims arising from the failure of the UM defendants to inform them of the testing error accrued when the act or omission occurred—on July 29, 2014. See MCL 600.5838a(1).

But plaintiffs did not discover that the UM defendants knew about the testing error until August 16, 2017—more than two years later—when Susan called the Yale laboratory and spoke to Dr. Bale who told her that UM had been so informed. Although the statute of limitations for medical malpractice is two years, MCL 600.5805(8), when a plaintiff discovers a claim two or more years after the alleged malpractice occurred, the six-month discovery rule provides the applicable limitations period. In particular, MCL 600.5838a(2) states, in pertinent part:

> Except as otherwise provided in this subsection, an action involving a claim based on medical malpractice may be commenced at any time within the applicable period prescribed in [MCL 600.5805] or [MCL 600.5851 through MCL 600.5856], or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later.

In concluding that plaintiffs' claims were time-barred, the trial court held that plaintiffs failed to establish that they should not have discovered their claims earlier. This conclusion appears to be based on the faulty premise that plaintiffs' claims arose from the actual testing error—as repeatedly asserted by defendants.[11] The trial court stated:

> As Defendants argue, Plaintiffs were 'equipped with the necessary knowledge to preserve and diligently pursue' their claims once they were aware of the testing discrepancy and, as they were told by Defendant Everett on November 30, 2016, that Regents 'did not mix up the test samples' and that 'lab errors were rare but that they happen.' The Court notes that Plaintiffs do not explain why they waited until August 16, 2017 to contact Yale.

The trial court concluded that plaintiffs should have discovered their claims no later than February 2017, when the retesting results were opposite than previously reported in 1999. "At that time, Plaintiffs knew of the significant or 50-50 chance that a testing error had occurred and that Defendants may have failed to inform them." We cannot agree.

As in *Solowy v Oakwood Hosp Corp*, 454 Mich 214, 216; 561 NW2d 843 (1997), "when the plaintiff should have discovered her claim is a question of law for resolution on summary disposition because the facts relevant to determining the issue were undisputed." And the fact is undisputed that plaintiffs did not discover until August 16, 2017 that the UM defendants knew

---

[11] As in their trial court briefs, throughout their appeal brief the UM defendants refer to the purported ability of plaintiffs to discover the testing error; however, the salient question is whether plaintiffs could have discovered that defendants *knew* about the testing error and nevertheless failed to inform plaintiffs of that error.

-11-

about the testing error. In other words, until that day, plaintiffs did not know that the UM defendants had a duty to inform them of the testing error (because they knew about it) and breached that duty because the UM defendants never informed plaintiffs of that testing error. "[T]he discovery rule period begins to run when, on the basis of objective facts, the plaintiff should have known of a possible cause of action." *Id*. at 222. Although it is undisputed that plaintiffs did not discover that the UM defendants knew of the testing error until August 16, 2017, the trial court concluded that plaintiffs should have known at the latest by February 2017. It was at that time, the court noted, that plaintiffs knew there was a chance of a testing error, and thus, they should have also known "that Defendants may have failed to inform them." But how would plaintiffs have discovered by February 2017 that the UM defendants actually knew about the testing error and yet failed to inform plaintiffs of this information?

"The relation between the treating physician and patient, requiring confidence, trust, and good faith, is founded on the proper diagnosis and treatment of medical problems." *Melynchenko v Clay*, 152 Mich App 193, 197; 393 NW2d 589 (1986). We refuse espouse a rationale that requires a patient to *assume* or *expect* that their health care provider, either through negligence or intentional concealment, would withhold or fail to disclose information critical to a patient's health and well-being. Just as this Court held in *Jendrusina v Mishra*, 316 Mich App 621, 635; 892 NW2d 423 (2016), "it would [] be highly disruptive to the doctor-patient relationship for courts to advise patients that they 'should' consider every new diagnosis as evidence of possible malpractice until proven otherwise." And, in this case, the failure of the UM defendant to inform plaintiffs of the critical information that their test results were incorrect arguably prevented plaintiffs from benefiting from the essential purpose of the genetic testing in the first place: to take precautionary measures and modify behavior in an effort to prevent and mitigate the risk of developing melanoma. In fact, defendants knew about the testing error and retesting recommendation over two years before Delaney was diagnosed with melanoma in November 2016 and over two years before she was retested for the p16 gene mutation in December 2016.

To summarize, the six-month discovery period is only triggered when plaintiffs *should have* discovered a possible cause of action. See *Jendrusina*, 316 Mich App at 635. There is no evidence in the lower court record to dispute the fact that, until August 16, 2017, plaintiffs did not know—and could not have known—that the UM defendants knew about the testing error and failed to inform them of the testing error. It was on that date, August 16, 2017, that plaintiffs would have discovered that the UM defendants not only had a duty to inform them of the testing error (because they knew about it), but also that the UM defendants breached that duty because plaintiffs were never informed of the testing error. Because plaintiffs served the UM defendants with a NOI on or about December 29, 2017, well within the six-month discovery rule—their lawsuit was timely. Accordingly, the trial court erroneously dismissed plaintiffs' claims against the UM defendants as time-barred.

In light of our conclusion that plaintiffs' complaint against the UM defendants was timely filed, we need not consider plaintiffs' argument that the fraudulent concealment exception, MCL 600.5855, applies and tolls the statute of limitations. That argument is moot and we will generally not decide moot issues. See *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998). The trial court's order granting the UM defendants' motion for summary disposition is reversed and this matter is remanded for further proceedings.

## III. YALE DEFENDANTS

Plaintiffs argue that their medical malpractice claims against the Yale defendants are also premised on the fact that they failed to inform plaintiffs of the genetic testing error when it was discovered in July 2014. Further, there was no way plaintiffs could have discovered that the Yale defendants also breached their duty to inform them of that testing error before August 16, 2017, when Susan spoke to Dr. Bale and he told her that the testing error had been discovered in July 2014. Thus, plaintiffs argue, their claims accrued for purposes of the statute of limitations on August 16, 2017, and are not time-barred. Accordingly, the Yale defendants were not entitled to summary disposition under MCR 2.116(C)(7). We agree.[12]

### A. STANDARD OF REVIEW

As set forth above, we review de novo a trial court's decision on a motion for summary disposition. *El-Khalil*, 504 Mich at 159. A motion under MCR 2.116(C)(7) should be granted if the claim is barred by the statute of limitations. *Sabbagh*, 329 Mich App at 335.

### B. STATUTE OF LIMITATIONS

Plaintiffs' claims against the Yale defendants are premised on the failure of the Yale defendants *to inform* them of the testing error once it was discovered on July 29, 2014—not for the testing error itself. As plaintiffs note, the Yale defendants do not contest on appeal that a physician-patient relationship existed, and they do not deny owing a duty to plaintiffs to inform them of the testing error. Further, the trial court did not base its dismissal decision on either claim. And it is undisputed that the Yale defendants did not inform plaintiffs of the testing error on July 29, 2014. Thus, for purposes of the statute of limitations, plaintiffs' claims arising from the failure of the Yale defendants to inform them of the testing error accrued when the act or omission occurred—on July 29, 2014. See MCL 600.5838a(1).

But plaintiffs did not discover that the Yale defendants failed to inform them of the testing error until August 16, 2017—more than two years later. Because plaintiffs discovered their claim more than two years after the alleged malpractice occurred, the six-month discovery rule provides the applicable limitations period. That is, the action must be brought within six months after plaintiffs discovered or should have discovered the existence of their claims. See MCL 600.5838a(2); *Jendrusina*, 316 Mich App at 635. For the reasons already discussed with regard to plaintiffs' claims against the UM defendants, we disagree with the trial court's conclusion that plaintiffs should have discovered their claims against the Yale defendants no later than February 2017. How would plaintiffs have known that the Yale defendants *knew* about the testing error and yet failed to notify them of that error despite their purported obligation to do so? Who would suspect that an error would be discovered regarding blood samples collected in 1999 by a quality control audit conducted in 2014—15 years later? Further, there is no evidence in the lower court record to dispute the fact that, until August 16, 2017, plaintiffs did not know—and could not have known—that the Yale defendants knew about the testing error and failed to inform them of the

---

[12] Plaintiffs concede in the appeal brief that their "claims dating back to 1999, when Yale committed the error, are barred by Michigan's statute of repose. MCL 600.5838a(2)."

testing error.  Because plaintiffs served their NOI on the Yale defendants on or about February 9, 2018, their lawsuit was timely.  Accordingly, the trial court erroneously dismissed plaintiffs' claims against the Yale defendants as time-barred.  The trial court's order granting the Yale defendants' motion for summary disposition is reversed and this matter is remanded for further proceedings.

Reversed and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto
/s/ Thomas C. Cameron